**STATE of Utah, Plaintiff and Appellant,**

v.

**David WORKMAN and Nita Workman, Defendants and Appellees.**

No. 900103–CA.

Court of Appeals of Utah.

Feb. 20, 1991.

---

R. Paul Van Dam, State Atty. Gen., Sandra L. Sjogren (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellant.

Edwin H. Beus (argued), Salt Lake City, for defendants and appellees.

Before BENCH, GARFF and GREENWOOD, JJ.

## OPINION

GARFF, Judge:

The State appeals from an arrest of judgment from a verdict finding both defendants guilty of charges of sexual exploitation of a minor and finding defendant Nita Workman guilty of a charge of obstruction of justice.

## FACTS

From 1985 through 1988, defendants David and Nita Workman, the parents of thirteen children, resided in Layton, Utah. Eleven or twelve of the children were living at home in 1986 when Clinton Kelly began visiting the family pursuant to a friendship he struck up with them in July 1985. Kelly visited the family three times in 1986 and six times in 1987 and once or twice in 1988. Kelly was friendly with all the Workman children, but he was particularly friendly with their daughter E., age seven in 1986. In April 1988, Mrs. Workman was informed by the Layton Police that Kelly was under investigation for sexual abuse of E. Kelly was later tried, convicted, and sentenced for sexual abuse of E.

During the time Kelly was visiting the Workmans, he presented himself as a clean-cut, polite young man who was impressed with the Workmans' family life and who was interested in learning more about the Workmans' religious beliefs. The family, having a history of taking in both short- and long-term house guests, welcomed Kelly into their home. When Kelly stayed with the family, he, for the most part, behaved as a family member in that he slept there, shared meals, participated in chores and meal preparation, and attended church.

Different family members noticed Kelly's growing attachment for E. The oldest daughter, married and living across the street, noticed Kelly's attachment for E., yet she did not approach her mother until Kelly's last visit in 1988. E. never told her mother about the abuse and she avoided telling her mother of the numerous gifts she was constantly receiving from him, including four $200 U.S. savings bonds. Mrs. Workman was aware that Kelly had agreed to provide ice skating lessons for E. because he opened a joint account with her in order to pay for the lessons. However, Mrs. Workman was unaware that he deposited hundreds of dollars into that account. She did make one withdrawal of eighty-five dollars. That withdrawal occurred after she was told by Layton Police that Kelly

was under investigation for sexual abuse of E.

From 1985 to 1988, Mrs. Workman was primarily involved with the never ending tasks of cleaning, cooking, canning, gardening, yard work, laundry, and chauffeuring required to maintain such a large household on a limited budget. Mrs. Workman's load was exacerbated by the fact that Mr. Workman's epilepsy prevented him from driving.

Kelly often bought gifts for E. and the rest of the children. However, E. always received the most gifts. In 1986, Kelly bought . gymnastics suits for the four younger girls, including E. The children all tried on their new suits. Mrs. Workman reprimanded them for wearing the suits without any tights underneath. Thereafter they wore tights.

According to Kelly this occurred "sometime" in 1986. Kelly testified that he took a series of photographs of E. in her new gymnastics suit. The photos were taken in the Workman residence and Mr. and Mrs. Workman can be seen in the background. The photos do not appear to be posed or arranged, but appear to have been taken in a spontaneous, candid manner. In one photo, Mr. Workman appears to be looking at the camera, but he does not appear to be posed or to notice that someone is taking his picture. Kelly equivocates on whether Mr. and Mrs. Workman were aware that he was taking pictures. At one point in his trial testimony, Kelly claimed they knew and they were angry at him for taking the photo. He also claimed that they did not know he was taking the photo.

Two of the photos show a normal family setting with E. showing off her new gymnastics suit. In the third photo, E. is bent over with her suit pulled up and her panties pulled down from either side of the crotch of the suit. The camera is focused on her partially exposed buttocks such that she appears to be "mooning" the camera. One of the Workman children testified that in 1984 and 1985 mooning was common among the younger children in the family to "gross people out." Mrs. Workman testified she was unaware the children did this.

The negative of this photo was recovered in 1988 and it was developed by the Layton Police. The Workmans testified they never saw the photo until the police showed it to them and that they were previously unaware of E.'s state of partial exposure and behavior.

Kelly took other photographs of E. Some of these were recovered as negatives from Kelly and some were recovered when Mrs. Workman, at the request of the Layton Police, searched her daughters' rooms and found the developed prints in the girls' photo albums. Many of the photographs show relatively normal family scenes. However, there is one photograph showing E. seated on Kelly's lap where Kelly is holding her close to his body and is kissing her full on the lips. Mrs. Workman is seen in the background walking toward the camera. She is looking to one side of the camera and does not appear to notice or to react to whoever the photographer is, nor does she appear to notice or to react to Kelly kissing E. There is another photograph showing E. wearing nothing but black lace panties and a black ostrich boa. No one else appears in this photo.

During 1987 and 1988, Mrs. Workman, on several occasions, had cause to reprimand Kelly. Once, Kelly told the Workmans that he loved E. and wanted to marry her. According to Kelly, this occurred "maybe" in 1987. Mrs. Workman responded that E. was too young. In 1987 or 1988, Mrs. Workman discovered that Kelly had bought some bras for E. She reprimanded him, telling him that E. was too young and that it was not his place to purchase intimate items of clothing for her. In the summer of 1988, Mrs. Workman received a telephone call from a neighbor who related that her child witnessed Kelly inappropriately kissing and touching E. in a swimming pool. In response, Mrs. Workman attempted several times to call the neighbor's child but could not get through. She questioned those of her children who were present at the pool and she questioned Kelly. They all denied that anything inappro-

priate had taken place and she let the matter drop. Mrs. Workman also, from time to time, reminded Kelly that the other children were hurt when he would favor E. over them.

Two times, and the record does not reveal precisely when, Mrs. Workman reprimanded Kelly for being on E.'s bed with her. One time Kelly was wearing levis and no shirt and the other time he was wearing levis, a shirt and tennis shoes. One time was on a hide-a-bed in the living room and the other was on the top of a bunk bed with E. and her sister. Both times he was on top of the covers and each time he told Mrs. Workman he had come in the bedroom only moments before to wake up E.

Mr. and Mrs. Workman were each charged with aggravated sexual abuse of a child, a first degree felony, in violation of Utah Code Ann. § 76–5–404.1 (1990), and sexual exploitation of a minor, a second degree felony, in violation of Utah Code Ann. § 76–5a–3(1)(b) (1990). Additionally, Mrs. Workman was charged with obstructing justice, a second degree felony, in violation of Utah Code Ann. § 76–8–306 (1990).

After a preliminary hearing, defendants were bound over to stand trial in the Second District Court where a jury trial was held. After evidence was taken and both sides had submitted their cases, the jury acquitted defendants of aggravated sexual abuse, convicted them of sexual exploitation of a minor, and convicted Mrs. Workman of obstructing justice. After the jury was polled, the judge reviewed the case with the jury. He discussed the elements of sexual exploitation and sexual abuse, including the required mental state. He defined many of the words used in the statute and explained the purpose and intent of the statute. He reviewed the elements of the charge of obstruction of justice, along with the requisite criminal intent. The judge then made the following ruling from the bench:

> For insubstantial or insufficient evidence on all of those charges, the Court will

grant [a motion to dismiss] in spite of the verdict, direct there be a verdict notwithstanding and a judgment notwithstanding the verdict in favor of the Workmans on all of the charges. And the case is finished.

The State filed a motion for reconsideration, which the court denied. Because the court believed that "the parties do not fully understand the Court[']s reasons for dismissing the charges," the court entered a written order explaining its reasons. The court then issued a final "Judgment Notwithstanding the Verdict" from which the State appeals.

### STATE'S RIGHT TO APPEAL

The threshold issue is whether the State has a right to appeal the court's ruling pursuant to Utah Code Ann. § 77–35–26(3)(a) (Supp.1989), the section in effect on the date of the State's notice of appeal, dated February 22, 1990.[1]

Section 77–35–26(3)(a) provided an exclusive list of criminal actions from which the State may appeal.

> (3) An appeal may be taken by the prosecution from:
> (a) a final judgment of dismissal;
> (b) an order arresting judgment;
> (c) an order terminating the prosecution because of a finding of double jeopardy or denial of a speedy trial;
> (d) a judgment of the court holding a statute or any part of it invalid;
> (e) an order of the court granting a pretrial motion to suppress evidence when, upon a petition for review, the appellate court decides that the appeal would be in the interest of justice; or
> (f) an order of the court granting a motion to withdraw a plea of guilty or no contest.

Utah Code Ann. § 77–35–26(3)(a) (Supp. 1989).

This section "delineates a narrow category of cases in which the prosecution may take an appeal." *State v. Waddoups*, 712

---

1. The new version of this section has been enacted as Utah Code Ann. § 77–18a–1 (Supp. 1990).

P.2d 223, 224 (Utah 1985). *See also State v. Musselman,* 667 P.2d 1061, 1064 (Utah 1983) (disallowing appeal as "dismissal" where ruling was clearly based on the trial court's assessment of the evidence and was therefore an acquittal); *State v. Kelbach,* 569 P.2d 1100, 1102 (Utah 1977) (State has no right to appeal except as expressly provided by statute); *Hartman v. Weggeland,* 19 Utah 2d 229, 429 P.2d 978 (1967) (State may not appeal when none of enumerated grounds of statute satisfied).

## DISMISSAL

■ To determine whether an appeal falls within one of these enumerated grounds, we look to the substance of the ruling and not to "the label attached ... by a trial judge." *Musselman,* 667 P.2d at 1064. Here, despite the fact the judge labeled his ruling as a dismissal, we do not find that this was an appealable dismissal. A dismissal is an "order or judgment finally disposing of an action, suit, motion, etc., without trial of the issues involved." Black's Law Dictionary 421 (5th ed. 1979). The *Musselman* court defined an appealable dismissal as a ruling "based on the trial court's construction of the applicable law *before* the court ruled on the sufficiency of the evidence to convict." 667 P.2d at 1065 (emphasis added). Here, the court's decision came *after* trial of the issues involved, and was a ruling on the sufficiency of the evidence. Further, this court recently held that the law allowing appeals from final orders of dismissal applies only to "dismissals where the court construed the applicable law before ruling on the sufficiency of the evidence to convict and before a final judgment." *State v. Amador,* 804 P.2d 1233 (Utah Ct.App.1990). Therefore, even if the judge's decision were a dismissal, the dismissal did not come before a ruling on the sufficiency of the evidence to convict and it is therefore not appealable as a final judgment of dismissal.

## ARREST OF JUDGMENT

■ We next consider whether this was an appealable arrest of judgment pursuant to Utah R.Crim.P. 23 (1990). The language of this rule differs substantially from that of the federal rule, which is based on common law and which provides for an arrest of judgment as a matter of law. The federal rule states, "The court on motion of a defendant shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged...." Fed.R. Crim.P. 34. The federal rule follows the common law arrest of judgment, which was the trial court's act of "refusing to enter judgment on the verdict because of an error appearing on the face of the record that rendered the judgment invalid." *United States v. Sisson,* 399 U.S. 267, 280–81, 90 S.Ct. 2117, 2124–25, 26 L.Ed.2d 608 (1970) (judgment could only be arrested for error on face of record and not on basis of proof offered at trial). *See State v. Owens,* 753 P.2d 976, 978 (Utah Ct.App.1988).

In contrast, the Utah rule allows for an arrest of judgment either as a matter of law or based on the facts proved: "At any time prior to the imposition of sentence, the court upon its own initiative may, or upon motion of a defendant shall, arrest judgment if *the facts proved or admitted* do not constitute a public offense, or the defendant is mentally ill, or there is other good cause for the arrest of judgment...." Utah R.Crim.P. 23 (1990) (emphasis added).

We read the emphasized language, which differs from the language of the federal rule, to be consistent with its plain meaning. That is, that a judgment may be arrested based on an insufficiency of the evidence or facts as proved in trial or as admitted by the parties.

Seemingly, this interpretation conflicts with the reasoning in *State v. Myers,* 606 P.2d 250, 252–53 (Utah 1980), where the main opinion holds that when "the dispute in the evidence justified submitting the issue to the jury ... [then] they were the exclusive judges of the credibility of the evidence." However, in note four, the supreme court stated, "We do not desire to have this decision understood as indicating that, in a proper case, the trial judge cannot grant a motion in arrest of judgment...." *Id.* at 253 n. 4. Thus, the

implication is that the trial court may invade the province of the jury in appropriate cases. The concurring opinion expanded on this notion, stating

> [A] court has the right, and indeed should exercise the duty, to arrest a judgment after a jury verdict in an appropriate case....
>
> In short, the legal mechanism of arresting a judgment is a firmly entrenched exception to the rule of law *in a proper case* that jurors are the exclusive judges of the credibility of the witnesses and the weight of the evidence.

*Id.* (emphasis in original).

For an appellate court, or a trial court, as is the case here, to substitute its judgment for that of the jury, the verdict must be based on evidence "so inherently improbable that no reasonable mind could believe it." *Id.* (citations omitted). Under such circumstances, an arrest of judgment is appropriate. Because we find the verdict to be based on inherently improbable evidence, we find this to be a proper case for an arrest of judgment. Because the case is before us as an arrest of judgment, we find the State has a right to appeal.

## SEXUAL EXPLOITATION

■ To establish a prima facie case of sexual exploitation, the State was required to present evidence on every element of the crime:

> A person is guilty of sexual exploitation of a minor:
>
> (a) When he knowingly produces, distributes, possesses, or possesses with intent to distribute, material or a live performance depicting a nude or partially nude minor for the purpose of sexual arousal of any person or any person's engagement in sexual conduct with the minor.

Utah Code Ann. § 76–5a–3 (1990).[2]

Even though E. is wearing a gymnastics suit, her state of dress fits the minimal *technical* definition of partial nudity.[3] The question then becomes whether defendants knowingly "produced, distributed, possessed" the photograph showing E. mooning the camera in her gymnastics suit, or knowingly allowed it to be taken, with intent to distribute it for the purpose of sexual arousal of Kelly.

Addressing the question of intent, the trial court wrote the following in a memorandum decision:

> Both defendants denied any knowledge of the existence of the photo or of seeing the photo until it was offered as evidence at the preliminary hearing. No evidence to the contrary was offered. They obviously knew photos were being taken, but not the angle of that photo.

The State argues that the photo also fulfills the criminal intent portion of the statute because defendants appear in the background of the picture, thus showing their knowledge that it was being taken. As support for this assertion, the State argues that Kelly testified that defendants were angry at him for taking the picture. The State also argues that circumstantial evidence indicates defendants knew that, prior to the photo being taken, Kelly had behaved inappropriately with E. and therefore defendants should have inferred that the photo (assuming they knew it had been taken) would be used to arouse Kelly. The State concludes that the jury could reasonably conclude that defendants saw E.'s state of dress, knew the picture had been taken, and knew that it would be used for Kelly's sexual arousal.

An examination of the record indicates that Kelly equivocated on whether defendants reacted to his taking the picture. Kelly testified to pulling E.'s panties down on either side of the gymnastics suit just before he took the picture. He admitted that Mrs. Workman probably did not know

---

**2.** The legislature set forth as justification for the sexual exploitation statute the following: "to eliminate the market for those materials and to reduce the harm to the minor inherent in the perpetuation of the record of his sexually exploitive activities." Utah Code Ann. § 76–5a–1 (1990). *See also State v. Bishop,* 753 P.2d 439, 480 (Utah 1988).

**3.** Partial nudity is defined in Utah Code Ann. § 76–5a–2 (1990) as "any state of dress or undress in which the human ... buttocks, ... is less than completely and opaquely covered."

he had purchased the panties worn by E. in the picture. Mrs. Workman corroborated, testifying that she did not remember the picture being taken and that she had never seen the picture or the panties before. Mr. Workman testified that he could not remember the picture being taken. Even though defendants knew that Kelly had behaved inappropriately with E., much of the inappropriate behavior that they knew about occurred in 1987 and 1988 and the photograph was taken in 1986. Moreover, any knowledge of inappropriate behavior does not go to whether they knew the photo was being taken, nor at what angle and focus. Further, while Kelly did testify to sexually abusing E., he never testified to being sexually aroused by the photo in question nor of taking or possessing it for the purpose of being aroused, nor of telling defendants that the photo aroused him.

In short, no evidence supports a conclusion that defendants knew that E.'s buttocks were only partially covered moments before the photo was taken, that they knowingly allowed Kelly to take or possess the photo, or that they knew the photo was taken or possessed by Kelly for the purpose of sexually arousing him. The State therefore failed to present any evidence on the intent element of the offense charged. Thus, the judge was justified in arresting the judgment on the basis that the facts proved did not constitute an offense.

## OBSTRUCTION OF JUSTICE

■ The State charged Mrs. Workman with obstruction of justice in violation of Utah Code Ann. § 76–8–306.[4] The requisite criminal intent is "with intent to hinder, prevent, or delay the discovery, apprehension, prosecution, conviction, or punishment of another for the commission of a crime...."

Again, where either a trial or an appellate court, substitutes its judgment for that of the jury, the verdict must be based on evidence "so inherently improbable that no reasonable mind could believe it." *State v. Myers,* 606 P.2d 250, 253 (Utah 1980) (Wilkins, J. concurring) (citations omitted). Under such circumstances, an arrest of judgment is appropriate.

The State claims that Mrs. Workman obstructed justice because she knew that Kelly was sexually abusing and exploiting E. and she deliberately withheld this information from the police until after they contacted her. The specific evidence relied on by the State is Mrs. Workman's knowledge that Kelly sent bras to E. in late 1987 or early 1988, her receipt of the telephone call about the pool incident in the summer of 1988, Kelly's statement that he wanted to marry E. made in 1987, and the period of daily long distance telephone calls for which there is no date. The State further claims that Mrs. Workman was motivated to obstruct justice because she shared with Kelly a joint account into which he deposited hundreds of dollars.

Mrs. Workman testified, and Kelly corroborated that she handled each incident as it came up. Each time, she reprimanded Kelly, informed him of the rules of her household and warned him not to do it again. Kelly testified that he concealed his abuse from the Workmans. In April 1988, when the police informed Mrs. Workman that Kelly was under investigation, she readily provided the police with whatever evidence and information they requested. In fact, it was Mrs. Workman who, at the request of the police, searched her daughters' bedrooms, found the lingerie and the photographs and turned them over to the police. Both Kelly and Mrs. Workman testified that the funds in the account were to pay for skating lessons for E., that Mrs. Workman never knew how much money

---

4. The information charging Mrs. Workman with violation of Utah Code Ann. § 76–8–306 charges as follows:

That on or about September, 1985 to August, 1989, at the place aforesaid [Layton], the defendants, as parties, with intent to hinder, prevent, or delay the discovery, apprehension, prosecution, conviction or punishment of an-

other for the commission of a crime did provide the offender a means for avoiding discovery or apprehension, obstruct by deception anyone from performing an act that might lead to discovery, apprehension, prosecution or conviction of a person, or conceal, alter or destroy physical evidence.

was in the account, and that she made only one withdrawal of eighty-five dollars. Finally, these incidents occurred over a two and a half year period, during which time Mrs. Workman was involved with the myriad tasks of running a household of thirteen to fourteen people plus guests.

We agree with the trial court that the evidence is inherently improbable such that a reasonable mind could not conclude that in 1986 and 1987 Mrs. Workman was aware that Kelly was sexually exploiting E. and that thereafter she helped him conceal the crime until April 1988. Further, it is inherently improbable that, even if she were aware of the abuse, the joint bank account would have motivated Mrs. Workman to conceal Kelly's abuse of her daughter. We therefore find that the trial court was justified in arresting judgment against Mrs. Workman because the facts proved did not support the offense charged.

Affirmed.

BENCH and GREENWOOD, JJ., concur.