2002 UT 88

WEBBANK, a Utah industrial loan corporation, Susan Soliz, Justin Magner, Econuel Ingram, and Johnny Childers, Plaintiffs and Appellees,

v.

AMERICAN GENERAL ANNUITY SERVICE CORP., a Texas corporation, Allstate Insurance Company, Allstate Settlement Company, a Nebraska corporation, and Metropolitan Insurance and Annuity Co., a Delaware corporation, Defendants and Appellant.

WebBank, a Utah industrial loan corporation, and Jesse Rodriguez, Plaintiffs and Appellees,

v.

Metropolitan Insurance and Annuity Co., a Delaware corporation, Defendant and Appellant.

WebBank, a Utah industrial loan corporation, and Justice Lockridge, Plaintiffs and Appellees,

v.

Metropolitan Insurance and Annuity Company, a Delaware corporation, Defendant and Appellant.

Nos. 20010253, 20010256, 20010259.

Supreme Court of Utah.

Aug. 16, 2002.

Glen F. Strong, Craig T. Jacobsen, David C. Wright, Salt Lake City, and Craig M. Lessner, Norcross, GA, for WebBank.

Stephen C. Baker, Michael J. Miller, Philadelphia, PA, and Milo Marsden, Salt Lake City, for American General Annuity Service Corp., Allstate Insurance Co., Allstate Settlement Co.

Bret F. Randall, Melissa J. Barbanell, Salt Lake City, for Metropolitan Insurance & Annuity Co.

RUSSON, Justice:

¶ 1 American General Annuity Service Corporation ("American General") appeals

the trial court's grant of summary judgment in favor of WebBank.[1] We reverse and remand.

## BACKGROUND

¶ 2 The instant case arises in connection with a financial transaction centered around a structured settlement agreement, specifically, the transfer of payments of money owing under the structured settlement agreement. A structured settlement agreement is a method for compensating an injured person. Under a structured settlement, a plaintiff becomes entitled to and receives an amount of money payable over time in the form of monthly and periodic payments ("structured settlement payments") as compensation for personal injury from a defendant or its insurer.

¶ 3 Structured settlements first came into common usage in the 1960s and 1970s and subsequently gained favorable tax status with a 1982 amendment to the federal Internal Revenue Code. At that time, Congress recognized that many personal injury victims were dissipating the settlements received as compensation for their tort claims, leaving them without means of support. In response to this concern, Congress amended the Internal Revenue Code to provide, among other things, tax benefits to personal injury victims and insurers that settle claims through the steady payment of settlement funds over an extended period of time. *See* 26 U.S.C. § 104(a)(2) (2002) (excluding such payments from the calculation of an individual's gross income for federal income tax purposes); 26 U.S.C. § 130 (2002) (providing tax benefits to certain personal injury liability assignments

and qualified funding assets). Consequently, structured settlements have become a common and familiar means of settling lawsuits.

¶ 4 In the unrelated, yet predicate, action to this case, Susan Soliz ("Soliz"), a personal injury victim, commenced a lawsuit arising out of an injury she suffered. To resolve the lawsuit, Soliz entered into a structured settlement agreement with the defendant in that action and/or the defendant's liability insurer under which she received monthly settlement payments. As part of the settlement agreement, Soliz agreed, among other things, that the payments to which she was entitled under the structured settlement agreement would not be accelerated or assigned. The structured settlement agreement, however, did provide that American General would assume the obligation to make future settlement payments to Soliz pursuant to the structured settlement agreement. Under this arrangement, structured settlement payments were made to Soliz without incident.

¶ 5 At some point after the initiation of the structured settlement payments, Soliz, for reasons irrelevant to this appeal, was in need of an immediate, lump-sum payment of money instead of the periodic payments she had been receiving under her structured settlement agreement. To this end, Soliz entered into a financial transaction with WebBank, an industrial loan corporation organized under the laws of this state. Under their Loan and Security Agreement ("security agreement") and attendant promissory note,[2] Soliz agreed to transfer her interest in her future structured settlement payments to WebBank in

1. Between November 1999 and April 2000, WebBank and its purported borrowers commenced more than seventy declaratory judgment actions. Many of those actions were summarily discontinued by WebBank and its purported borrowers. The trial court consolidated the four declaratory actions that are the subject of this appeal. The trial court then granted summary judgment in favor of WebBank and its purported borrowers in those four consolidated actions and in two other actions against Metropolitan Insurance and Annuity Company ("Metropolitan"). For purposes of appeal, this court consolidated all of these actions. Pursuant to a stipulated motion, the actions on appeal against Metropolitan were

dismissed. Allstate Insurance Company, Allstate Settlement Corporation, and American General collectively briefed the legal issues involved in this consolidated appeal and submitted one unified memorandum of law in support of their position. Prior to the rendering and issuance of this opinion, Allstate Insurance Company and Allstate Settlement Corporation settled their dispute with WebBank, leaving American General as the sole appellant in this case.

2. The two documents incorporate each other by reference and together are the primary documents that compose the transaction at issue.

exchange for a purported loan.[3] In other words, Soliz sought to exchange her structured settlement payments over a period of time for an immediate, lump-sum payment from WebBank, and WebBank offered to lend her a present sum of money and required her to secure the repayment of the purported loan with her future stream of structured settlement payments as collateral. In addition, as a condition precedent to the execution of the purported loan and the immediate payment of a lump sum to Soliz, WebBank required the receipt of a final, non-appealable court order determining that WebBank had a security interest in the structured settlement payments as collateral for the purported loan. It also required that payments on the purported loan be made directly from American General to WebBank, thus by-passing Soliz. That financial transaction and its underlying security agreement are the subject of this appeal.

## PROCEDURAL HISTORY

¶ 6 Sometime between November 1999 and April 2000, WebBank, for itself and on behalf of Soliz, commenced a declaratory judgment action seeking a judicial determination pursuant to the conditions precedent required in the security agreement.

¶ 7 WebBank and American General filed cross-motions for summary judgment. On August 18, 2000, the trial court granted partial summary judgment in favor of WebBank, denied American General's motion for summary judgment, and permitted further discovery focused on the discrete and, in the trial court's view, dispositive issue of whether the financial transaction between WebBank and Soliz was a loan or a sale. After further discovery, WebBank and American General renewed and re-briefed their motions for summary judgment. On November 13, 2000, the trial court granted summary judgment in favor of WebBank on the remaining issue of whether the financial transaction between WebBank and Soliz should be considered a loan or a sale, concluding that there were no genuine issues of material fact and that the transaction or transfer was as a matter of law a loan instead of a sale or an assignment. American General timely appealed.

¶ 8 On appeal, American General argues that the trial court erred in concluding as a matter of law that the financial transaction between WebBank and Soliz was a loan and not a sale because the question of whether the parties to a particular transaction, such as the one in this case, intended to create a loan or a sale is a question of fact to be resolved by the trier of fact, therefore precluding the grant of summary judgment. In addition, American General asserts that, despite the lack of any ambiguity in the terms and provisions of the security agreement and promissory note, the nature and character of the transaction as a whole is ambiguous, and that the existence of such an ambiguity as to WebBank's and Soliz's true intent regarding the nature or character of the transaction should have precluded the trial court's grant of summary judgment.[4] Alternatively,

3. It is important to note that the Utah Legislature, during the 2002 general session, passed Senate Bill 163, the Structured Settlement Protection Act ("S.B. 163" or "Act"), S.B. 163, 54th Leg., Gen. Sess., 2002 Utah Laws ——, which became effective as to transfers in connection with structured settlement agreements on May 6, 2002. This statute sets forth guidelines for transferring structured settlements, establishes disclosure, notice, and hearing requirements, and requires that such transfer agreements be approved by a court. The Act also exempts such transfers from application of Utah's version of Article 9 of the Uniform Commercial Code ("UCC"), Utah Code Ann. §§ 70A–9a–101 to –709 (Supp.2001). While this statute is meant to govern all such transactions in the future, it does not affect our decision in this case. *See State ex rel. Div. of Forestry, Fire & State Lands v. Tooele County*, 2002 UT 8, n. 2, 44 P.3d 680 (noting that law as it existed at time of events giving rise to suit governs).

References to Article 9 of the UCC hereinafter are to the 1997 Utah Code version of Article 9. That version of Article 9 was in effect at the time the transaction at issue in this case was executed. The previous version of Article 9 was repealed and supplanted with the passage of Senate Bill 168 during the 2000 general session. *See* S.B. 168, 53d Leg., Gen. Sess., 2000 Utah Laws 866–943. The new version of Article 9 became effective July 1, 2001. *Id.*

4. As noted above, structured settlement agreements, including the one related to the instant transaction, commonly include an anti-assignment provision. Presumably, the anti-assignment provision in Soliz's structured settlement agreement would prohibit her from transferring

American General argues that, even if the trial court did not err in concluding that the transaction in question was a loan, it did err by concluding that Article 9 of the UCC governed the transaction and that the "tort exemption" and/or the "insurance and annuity exemption" of Article 9 of the UCC, codified at Utah Code Ann. § 70A–9–104(k) and –104(g) (1997) respectively, did not apply to the transfer of Soliz's structured settlement payments to WebBank.

¶ 9 WebBank counters that the trial court correctly held that as a matter of law WebBank and Soliz intended to create a security interest in favor of WebBank in the structured settlement payments through their security agreement and related promissory note. WebBank argues that the trial court could properly decide this issue as a matter of law because the trial court needed only look to the four corners of the unambiguous security agreement and promissory note executed between WebBank and Soliz to determine that WebBank and Soliz intended to create a security interest in the structured settlement payments, and consequently, a secured transaction subject to Article 9 of the UCC.[5] Furthermore, WebBank contends that the trial court was correct in concluding that Article 9 of the UCC governed the transaction and that the exemptions to the application of Article 9 did not apply.

### STANDARD OF REVIEW

¶ 10 A trial court may properly grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c); *see also Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶ 21, 48 P.3d 895; *Ault v. Holden,* 2002 UT 33, ¶ 15, 44 P.3d 781; *State ex rel. Div. of Forestry, Fire & State Lands v. Tooele County,* 2002 UT 8, ¶ 8, 44 P.3d 680. The propriety of a trial court's grant of summary judgment is a question of law. *Holmes Dev.,* 2002 UT 38 at ¶ 21, 48 P.3d 895. In deciding whether summary judgment was appropriate, we need review only whether the trial court erred in applying the relevant law and whether a material fact was in dispute. *Id.; Hill v. Allred,* 2001 UT 16, ¶ 12, 28 P.3d 1271. "We thus review the trial court's legal conclusions for correctness, according them no deference." *Holmes Dev.,* 2002 UT 38 at ¶ 21, 48 P.3d 895; *see also Ault,* 2002 UT 33 at ¶ 15, 44 P.3d 781.

### ANALYSIS

¶ 11 On appeal, both WebBank and American General agree that the central issue in this case concerns WebBank's and Soliz's intentions, that is, whether WebBank and Soliz intended to create a secured transaction, i.e., a loan, secured by Soliz's structured settlement payments or whether they actually intended to effectuate a sale or an assignment of Soliz's interest in her structured settlement payments disguised as a loan. WebBank and American General disagree, however, on the proper means for determining or discerning WebBank's and Soliz's true intent regarding the transaction, and conse-

---

her interest in her structured settlement payments to a third party such as WebBank.

Ultimately, American General seeks to have the transaction in question deemed a sale or an assignment in order to trigger the anti-assignment provision of the structured settlement agreement, thus precluding or invalidating the transaction between WebBank and Soliz.

5. WebBank seeks to have the transaction at issue declared a loan, i.e., a secured transaction, in order for the transaction to be governed by Article 9 of the UCC. Under Utah's version of Article 9 of the UCC, specifically subsection 70A–9–318(4) (1997), a contractual term, such as the anti-assignment provision in the structured settlement agreement, is ineffective if it "prohibits assignment of an account or prohibits creation of a security interest in . . . a general intangible for money due or to become due [i.e., the structured

settlement payments]." *Id.* According to WebBank, this provision would apply if the transaction in question is deemed a loan or secured transaction. WebBank therefore seeks to trigger this provision of the statute in order to prevent the anti-assignment clause of the structured settlement agreement from invalidating Soliz's attempted transfer of her future structured settlement payments to WebBank in exchange for an immediate, lump-sum payment of money from WebBank. It is for this reason that WebBank urges the interpretation of the financial transaction in this case as a loan or secured transaction instead of a sale or simple assignment to which the anti-assignment provision of Soliz's structured settlement agreement presumably would be effective and section 70A–9–318(4) inapplicable.

quently, the proper characterization of the transaction as a loan or a sale. They also disagree as to whether the trial court or the jury, as the trier of fact, should properly make such a determination as to WebBank's and Soliz's intentions.

¶ 12 American General contends that the trial court erred in its determination as a matter of law that the transaction between WebBank and Soliz was a loan, relying on a line of cases that, according to American General, stands for the general proposition that the question of whether a transaction is a loan or a sale is a question of fact to be decided by the trier of fact, thus precluding summary judgment. In American General's view, the ambiguity or uncertainty as to whether WebBank and Soliz intended their transaction to be a genuine loan or a sale masquerading as a loan presents a triable issue of fact.

¶ 13 WebBank relies on our general principles of contract construction and interpretation to argue that the trial court did not err in interpreting as a matter of law WebBank and Soliz's security agreement as creating a secured transaction or loan by ascertaining WebBank's and Soliz's true intentions regarding the nature and character of the transaction from the clear and unambiguous language contained in the four corners of their security agreement and promissory note.

¶ 14 To resolve this matter, we must review whether the trial court's interpretation of the security agreement was proper insofar as it explicitly determined as a matter of law that the transaction in question was a loan, and insofar as it implicitly determined that the language of the security agreement was unambiguous, and consequently, that WebBank and Soliz intended the transaction to be a loan.

¶ 15 We begin with a review of our well-settled rules of contract interpretation. In our review of the trial court's conclusion, " '[w]e accord [its] interpretation of [the] contract no deference and review it for correctness.' " *Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶ 12, 6 P.3d 1129 (alterations in original) (quoting *Aquagen Int'l, Inc. v. Calrae Trust*, 972 P.2d 411, 413 (Utah 1998)).

¶ 16 WebBank and Soliz effectuated the financial transaction in question through various documents, including a security agreement and a promissory note. A security agreement is a contract that is interpreted according to the well-settled rules of contract construction. 68A Am.Jur.2d *Secured Transactions* § 163 (1993); Ronald A. Anderson, 8A *Anderson on the Uniform Commercial Code* § 9–203:51 (3d ed.1996). The same is true for a promissory note. 10 C.J.S. *Bills and Notes* § 79 (1995) ("The rules of construction applicable to contracts are applicable to bills and notes.").

¶ 17 The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract. *Peterson v. Coca–Cola USA*, 2002 UT 42, ¶ 9, 48 P.3d 941; *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 14, 28 P.3d 669. " 'In interpreting a contract, the intentions of the parties are controlling.' " *Dixon v. Pro Image, Inc.*, 1999 UT 89, ¶ 13, 987 P.2d 48 (quoting *Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991)); *see also Peterson v. Sunrider Corp.*, 2002 UT 43, ¶ 18, 48 P.3d 918. Moreover, specifically in the context of interpreting a security agreement, "[t]he controlling factor in determining whether a transaction is in fact a security transaction or an absolute sale is the intent of the parties .... " 79 C.J.S. *Secured Transactions* § 24 (1995); *see also* 68A Am.Jur.2d *Secured Transactions* § 5 ("[T]he principal test for determining whether there· is a secured transaction under Article 9 is the intent of the parties; that is, the test for determining whether a transaction is a secured transaction governed by Article 9 is whether the parties intended the collateral to secure the payment or performance of an obligation.").

¶ 18 In interpreting a contract, " '[w]e look to the writing itself to ascertain the parties' intentions, and we consider each contract provision ... in relation to all of the others, with a view toward giving effect to all and ignoring none.' " *Jones*, 2000 UT 61 at ¶ 12, 6 P.3d 1129 (quoting *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) (further quota-

tion omitted)); *see also Cent. Fla. Invests., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599; *Dixon*, 1999 UT 89 at ¶ 14, 987 P.2d 48.

¶ 19 "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Cent. Fla. Invests., Inc.*, 2002 UT 3 at ¶ 12, 40 P.3d 599; *see also Sunrider Corp.*, 2002 UT 43 at ¶ 18, 48 P.3d 918; *Dixon*, 1999 UT 89 at ¶ 13, 987 P.2d 48; *Winegar*, 813 P.2d at 108. However, if the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, "extrinsic evidence must be looked to in order to determine the intentions of the parties." *Cent. Fla. Invests., Inc.*, 2002 UT 3 at ¶ 12, 40 P.3d 599; *see also Sunrider Corp.*, 2002 UT 43 at ¶ 18, 48 P.3d 918; *Coca-Cola USA*, 2002 UT 42 at ¶ 9, 48 P.3d 941; *SME Indus., Inc.*, 2001 UT 54 at ¶ 14, 28 P.3d 669. If a contract is ambiguous, the court may consider the parties' actions and performance as evidence of the parties' true intention. *See Plateau Mining Co.*, 802 P.2d at 725.

¶ 20 An ambiguity exists in a contract term or provision "if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.' " *SME Indus., Inc.*, 2001 UT 54 at ¶ 14, 28 P.3d 669 (quoting *Winegar*, 813 P.2d at 108 (further quotation omitted)); *see also Sunrider Corp.*, 2002 UT 43 at ¶ 19, 48 P.3d 918; *Coca-Cola USA*, 2002 UT 42 at ¶ 9, 48 P.3d 941; *Cent. Fla. Invests., Inc.*, 2002 UT 3 at ¶ 12, 40 P.3d 599.

¶ 21 Specifically in the context of whether a particular agreement should be considered a secured transaction for purposes of Article 9 of the UCC, however, we have extended the notion of ambiguity in contracts to include instances where, despite the lack of ambiguity in the terms and provisions of the contract themselves, an ambiguity exists as to the nature and character of the contract or transaction as a whole. *See Colonial Leas-*

*ing Co. of New England, Inc. v. Larsen Bros. Constr. Co.*, 731 P.2d 483, 487 (Utah 1986).

¶ 22 "Whether an ambiguity exists in a contract is a question of law." *Winegar*, 813 P.2d at 108; *see also Sunrider Corp.*, 2002 UT 43 at ¶ 14, 48 P.3d 918; *Dixon*, 1999 UT 89 at ¶ 14, 987 P.2d 48. "When ambiguity exists, the intent of the parties becomes a question of fact." *SME Indus., Inc.*, 2001 UT 54 at ¶ 14, 28 P.3d 669; *see also Plateau Mining Co.*, 802 P.2d at 725. "[A] motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983); *see also Sunrider Corp.*, 2002 UT 43 at ¶ 14, 48 P.3d 918; *Winegar*, 813 P.2d at 108. "Therefore, in considering a motion for summary judgment, '[f]ailure to resolve an ambiguity by determining the parties' intent from parol evidence is error.' " *SME Indus., Inc.*, 2001 UT 54 at ¶ 14, 28 P.3d 669 (alteration in original) (quoting *Plateau Mining Co.*, 802 P.2d at 725).

¶ 23 In the case at hand, the trial court determined as a matter of law based upon the security agreement and promissory note composing the financial transaction and the undisputed facts that WebBank and Soliz had executed a secured transaction in the form of a loan secured by Soliz's right to receive future structured settlement payments. In making this determination, the trial court implicitly determined that there was no ambiguity in the security agreement that would have required extrinsic evidence to resolve and that would have precluded summary judgment.

¶ 24 WebBank argues, in accordance with our established rules of contract interpretation and construction, that the language of the security agreement is clear and unambiguous, and that the trial court was therefore correct in determining from the four corners of the security agreement that WebBank and Soliz intended to create a secured transaction and that the financial transaction was a loan. We disagree.

¶ 25 We consider this case to be sufficiently similar to *Colonial Leasing* to be governed by it. In *Colonial Leasing*, the plaintiff transferred possession of a piece of construction equipment to the defendant pursuant to a document called a "lease." *Id.* at 484. The defendant defaulted on the payments required under the agreement, and the plaintiff sued for damages. The defendant argued that the terms of the agreement indicated that the contract was meant not as a true lease, but instead as a security agreement for the sale of the construction equipment. *Id.* at 487. The plaintiff argued that the agreement was plainly a lease on its face and according to its terms. Faced with this situation, we held:

> In some cases, such a judgment [as to whether the parties intended an agreement to constitute a lease or security agreement] may be apparent from the face of the document, but in other cases, the basic nature of the agreement, judging solely from its contents, may be ambiguous. It is the general rule that if an agreement is ambiguous because of a lack of clarity in the meaning of particular terms, it is subject to parol evidence as to what the parties intended with respect to those terms. We hold that that rule also applies where the character of the written agreement itself is ambiguous even though its specific terms are not ambiguous.

*Id.* (citations omitted). The court reversed the trial court's grant of summary judgment and remanded so that parol evidence as to the parties' intentions regarding the nature and character of the transaction could be presented. *Id.* at 487–88.

■■■ ¶ 26 *Colonial Leasing*, much like the case at hand, involved the issue of the interpretation of an agreement and whether the agreement, depending on its proper characterization, was a security agreement governed by Article 9 of the UCC. Our holding in *Colonial Leasing* is consistent with the general rules for interpreting security agreements in that, by allowing extrinsic evidence to determine the parties' intent as to whether the agreement was a security agreement, we ensured on remand that the trial court would properly focus the inquiry on the intent of the parties, on the substance, not on the mere form, of the transaction, and on the entire surrounding context of the transaction. *See id.* at 487 (concluding that "the need for parol evidence [was] also suggested by the nature and the terms of the lease itself and the surrounding circumstances" and outlining factors for determining whether transaction was lease or security agreement); *see also* 79 C.J.S. *Secured Transactions* § 24 ("The controlling factor in determining whether a transaction is in fact a security transaction or an absolute sale is the intent of the parties which is ascertained from all of the facts and circumstances surrounding the transaction, including the language of the agreement."); *id.* § 41 ("It is substance, not form, which is decisive in determining whether an agreement is intended to create a security interest.... Parol evidence ... may be permitted to inform the determination of whether the parties actually intended to create a security interest."). The inquiry as to whether the parties intended to create a secured transaction presents a question of fact for the trier of fact. *See* 68A Am.Jur.2d *Secured Transactions* § 159 ("It is a question of fact whether a writing was intended to create a security interest ...."); 8A *Anderson on the Uniform Commercial Code* § 9–203:34 (same); 79 C.J.S. *Secured Transactions* § 41 ("[T]he issue of whether there was a meeting of the minds as to whether there was an underlying contractual intent to create a security agreement is a question of fact.").

¶ 27 Here, American General and Web-Bank have "presented contrary, tenable interpretations" of the nature and character of the contract and the transaction as a whole as either a secured transaction or an assignment or sale transaction. *SME Indus., Inc.,* 2001 UT 54 at ¶ 14, 28 P.3d 669. American General points to provisions of the security agreement and promissory note, such as the grant of an irrevocable and absolute power of attorney by Soliz to WebBank, the provision that renders the "collateral" the principal source of repayment of the alleged loan, and the explicit reference to the loan payments to be made by Soliz as the "[a]ssigned [p]ayments," that support its interpretation of the contract and the true character of the transaction as a sale or an assignment. WebBank

likewise points to other provisions of the contract that are indicative of a loan transaction. Both interpretations are tenable, reasonable, and supportable after a careful review of the documents. Accordingly, it is unclear from the language and provisions contained in the security agreement and promissory note whether WebBank and Soliz intended to effectuate a genuine secured transaction or whether they intended to create a sale or an assignment.

¶ 28 Despite the absence of ambiguity in the contract language and provisions themselves, we conclude that an ambiguity exists as to the nature or character of the transaction as a whole. *See Colonial Leasing,* 731 P.2d at 487. In other words, when we view all of the provisions of the contract together, we conclude that an ambiguity exists as to whether WebBank intended to create a genuine loan transaction or a sale or an assignment disguised as a loan transaction. Because the nature and character of the transaction is ambiguous and the intent of the parties unclear, resort to extrinsic evidence is required to determine the intent of the parties to the security agreement and promissory note. *See Cent. Fla. Invests., Inc.,* 2002 UT 3 at ¶ 12, 40 P.3d 599; *see also Sunrider Corp.,* 2002 UT 43 at ¶¶ 18, 23, 48 P.3d 918; *SME Indus., Inc.,* 2001 UT 54 at ¶ 15, 28 P.3d 669; *Dixon,* 1999 UT 89 at ¶ 14, 987 P.2d 48; *Winegar,* 813 P.2d at 108; *Faulkner,* 665 P.2d at 1293. Such ambiguity may be resolved only by the trier of fact after consideration of parol or extrinsic evidence as to the parties' intentions, that is, a review and evaluation of all the facts and circumstances surrounding the substance of the transaction. *See Winegar,* 813 P.2d at 108; *Colonial Leasing,* 731 P.2d at 487; 79 C.J.S. *Secured Transactions* § 24. Therefore, the trial court erred in granting summary judgment to WebBank. *See SME Indus., Inc.,* 2001 UT 54 at ¶ 15, 28 P.3d 669; *Colonial Leasing,* 731 P.2d at 487–88.

¶ 29 Because the grant of summary judgment was improper due to the existence of a disputed factual issue as to WebBank's and Soliz's intentions and the nature and character of the transaction, we reverse and remand for trial in order that extrinsic evidence may be presented as to WebBank's and Soliz's intentions regarding the nature and character of the transaction.

¶ 30 Furthermore, because we remand for determination of the parties' intent in connection with the transaction and the true character of the transaction, that is, because the transaction's legal classification as a loan or a sale remains undetermined, we do not reach the parties' arguments regarding the legal question of whether certain exceptions to Article 9 of the UCC apply to the transaction at issue in this case.

**CONCLUSION**

¶ 31 For the foregoing reasons, the trial court's grant of summary judgment to WebBank was improper. We reverse and remand for a trial to determine the intentions of the parties and the character of the transaction.

¶ 32 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice HOWE, and Justice WILKINS concur in Justice RUSSON's opinion.