2007 UT App 265

**TOM HEAL COMMERCIAL REAL ESTATE, INC.; and Walker & Company Real Estate, Plaintiffs and Appellees,**

v.

**John YORK and Lesa York, Defendants and Appellants.**

No. 20060237–CA.

Court of Appeals of Utah.

Aug. 2, 2007.

Donald E. McCandless and Thomas J. Scribner, Provo, for Appellants.

Stephen Quesenberry and Charles L. Perschon, Provo, for Appellees.

Before Judges McHUGH, ORME, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Defendants John and Lesa York appeal the trial court's order, entered after a bench trial, granting Plaintiffs Tom Heal Commercial Real Estate, Inc. and Walker & Company Real Estate's breach of contract claim. We affirm.

## BACKGROUND

¶ 2 In June 2000, the Yorks owned a commercial building and associated real property (the Property) located in American Fork, Utah. On June 28, 2000, the Yorks entered into a listing agreement with Plaintiffs to sell or lease the Property. The Property was not sold or leased during the term of the listing agreement. On March 28, 2001, the Yorks entered into a second listing agreement (the Listing Agreement) with Plaintiffs. The Listing Agreement included a brokerage fee provision which provided, in pertinent part, that if "the Property is sold to a tenant during the term of the lease or within 180 days of expiration of the lease or any renewals thereof, the [s]eller shall pay to [t]he [c]ompany a commission equal to six percent (6%) of the sale price." [1]

¶ 3 On July 1, 2001, the Yorks entered into a lease agreement (the Lease Agreement) with Utah Valley State College (UVSC) and Mountainland Advanced Technology Center (MATC) [2] for a term of ten years. About

---

1. The Listing Agreement identifies John York as the seller and Tom Heal Commercial Real Estate, Inc. as the company.

2. When the parties entered into the Lease Agreement, UVSC was the fiscal agent for MATC. Sometime thereafter, MATC was made a subsidiary of Utah Applied Technology College. As a result, Mountainland Advanced Technology Center was renamed Mountainland Applied Technology Center, became independent of UVSC, and was granted its own budget. For ease of reference, we also address Mountainland Applied Technology Center as MATC.

two years later, MATC's President, Robert Brems, approached the Yorks about purchasing the Property. However, MATC was not able to purchase the Property at the time because it did not have authority to purchase real property independent of legislative action. MATC sought assistance from another legislatively created educational entity, Alpine School District (Alpine), which unlike MATC had the ability to purchase property.[3]

¶ 4 On July 21, 2003, Alpine made an offer to purchase the Property from the Yorks for $2,000,050. Mr. York contacted Tom Heal and asked him to review and assist in responding to the offer. After analyzing the numbers, Mr. Heal recommended that the Yorks counter the offer in the amount of $2,600,000. At Mr. York's request, Mr. Heal prepared a real estate purchase contract that Mr. York took home to review. Several days later, Mr. Heal called Mr. York to determine the status of his review of the counter-offer, and Mr. York told Mr. Heal that because a tenant was not purchasing the property he was not obligated to pay the six percent commission.

¶ 5 On November 3, 2003, Mr. Brems arranged and paid to have the Property appraised. On May 14, 2004, Alpine entered into an agreement (the Lease–Purchase Agreement) with MATC to lease the Property to MATC for a term of twelve years and seven months with an exclusive right and option to purchase the premises at any time. The Lease–Purchase Agreement provided that "the purchase price of the [Property] has been fully negotiated by the parties, and shall be in accordance with the [p]urchase [p]rice [s]chedule set forth ... [in e]xhibit B." The purchase price outlined in exhibit B decreases according to a fixed schedule such that, if MATC made all of the scheduled lease payments at the end of the lease, Alpine would be required to transfer the Property to MATC without further payment.

¶ 6 On May 27, 2004, Alpine ultimately purchased the Property from the Yorks for

$2,656,000. MATC contributed an initial payment of approximately $620,000 to the purchase of the Property. On June 16, 2004, Plaintiffs filed a complaint alleging breach of contract and breach of the covenant of good faith and fair dealing. Plaintiffs sought contractual and consequential damages including a sales commission, interest, penalties, and attorney fees. On November 3, 2005, a bench trial was held after which the trial court ruled that the lease between Alpine and MATC was an installment purchase. The trial court concluded that MATC was a tenant, procured by Plaintiffs, who purchased the Property within the lease term, and that, therefore, Plaintiffs were entitled to a commission from the subsequent sale. The trial court awarded attorney fees to Plaintiffs. The Yorks filed this appeal.

## ISSUE AND STANDARD OF REVIEW

¶ 7 The Yorks appeal the trial court's determination that Plaintiffs were entitled to a commission under the terms of the Listing Agreement. Specifically, the Yorks challenge the trial court's interpretation of various terms in the Listing Agreement. "Interpretation of contract terms is a question of law. We review a trial court's legal conclusions for correctness." *Canyon Meadows Home Owners Ass'n v. Wasatch County*, 2001 UT App 414, ¶ 7, 40 P.3d 1148.

## ANALYSIS

### I. Interpretation of Listing Agreement Terms

¶ 8 The trial court ruled that the Lease–Purchase Agreement between Alpine and MATC was in fact an installment purchase [4] of the Property, which constituted a sale to a tenant during the term of the Lease Agreement and therefore triggered a commission under the Listing Agreement. The Yorks argue that this ruling is based on an incorrect interpretation of the terms "sold to a tenant" and "seller" in the Listing Agreement. Specifically, the Yorks argue that the

---

3. The Property is located near Alpine High School. MATC provided many Alpine High School students with vocational training.

4. We note that the Yorks do not dispute the trial court's conclusion that the Lease–Purchase Agreement is in fact an installment purchase by MATC. Rather, they challenge the trial court's ruling on other grounds.

trial court's ruling is erroneous because (1) the Yorks did not sell the Property to MATC and (2) MATC lacked statutory authority to purchase the Property.

¶ 9 "A listing agreement is a contract between a real estate broker and a seller." *Fairbourn Commercial, Inc. v. American Hous. Partners, Inc.*, 2003 UT App 98, ¶ 15, 68 P.3d 1038. "In interpreting a contract, [w]e look to the writing itself to ascertain the parties' intentions, and we consider each contract provision ... in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139 (alteration in original) (quotations and citations omitted). "'If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.'" *Id.* at ¶ 19 (quoting *Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599).

¶ 10 Central to this dispute is the brokerage fee provision in the Listing Agreement which provides, in pertinent part, that "[i]n the event the [P]roperty is *sold to a tenant* during the term of the lease or within 180 days of expiration of the lease or any renewals thereof, the *[s]eller* shall pay to [t]he [c]ompany a commission equal to six percent (6%) of the sale price." (Emphasis added.) The Yorks argue that MATC's purchase of the property did not trigger a commission because the language in the Lease–Purchase Agreement provides for a commission only if the Yorks sell the Property to a tenant. The Yorks maintain that they did not sell the Property to MATC, and emphasize that they sold the Property to Alpine. Indeed, a sales transaction between the Yorks and Alpine was completed. However, the trial court declined to consider this sales transaction in isolation and instead considered the sale as part of a series of transactions initiated by MATC, as a course of action, to acquire the Property. As a result, the trial court looked to the substance rather than the form of the transaction and concluded that although the sale was completed with two separate purchase contracts-the Real Estate Purchase Contract between Alpine and the Yorks and the Lease–Purchase Agreement between Alpine and MATC-it was in effect one transaction, with the Yorks as the seller, Alpine as the financier, and MATC as the purchaser. We agree with the trial court's analysis.

¶ 11 A review of the various sales transactions supports the trial court's conclusion that the Yorks sold the Property to MATC. The record reveals that MATC acted in all regards as the entity actually purchasing the property from the Yorks. Specifically, MATC negotiated the terms of the purchase with the Yorks;[5] located Alpine to act as a financier; entered into a Lease–Purchase Agreement with Alpine to facilitate the purchase; arranged and paid for the Property's appraisal; contributed approximately $620,000 toward the initial purchase payment; and ultimately received equitable title to the Property. Likewise, the record reveals that Alpine acted in every manner as a financier of the purchase and never exercised a possessory right to the Property. In particular, Alpine memorialized the financing terms in a Lease–Purchase Agreement with MATC and approximately two weeks later assisted in the transaction by advancing the funds and closing on the Property. Because Alpine's involvement in the sale was akin to that of MATC's financier and not that of a purchaser, we agree with the trial court's conclusion that the Yorks ultimately sold the Property to MATC rather than Alpine.

¶ 12 In sum, although the purchase of the Property was accomplished in part with a type of lease document between Alpine and MATC, the substance of the transaction was in fact a sale of the Property from the Yorks to MATC with the assistance of Alpine as financier. Considering the substance, not just the form, of the transaction, this court concludes that the trial court did not err in interpreting the plain language of the brokerage fee provision to require a commission

---

**5.** At trial, Mr. Brems testified that it was his idea to purchase the Property, that he went to Alpine to figure out a way to finance the purchase, and that he negotiated the terms of the purchase with the Yorks on MATC's behalf.

under the Listing Agreement. *See Erickson v. Beardall,* 20 Utah 2d 287, 437 P.2d 210, 212 (1968) (determining that the true nature of the parties' property settlement was really an award for support, and stating that "it is the duty of the court to look to substance rather than to form"); *MacKay v. Hardy,* 896 P.2d 626, 629 (Utah 1995) (applying substance over form to affirm that a nonprofit corporation was formed merely as a "straw man" and that the partnership at issue actually held an equity interest in the nonprofit's inventory). Moreover, Plaintiffs fully performed their obligations under the Listing Agreement,[6] and the form of the transaction will not prevent or defeat the commission.

## II. Voidability of the Lease–Purchase Agreement

¶ 13 The Yorks also argue that MATC lacked statutory authority[7] to enter into the Lease–Purchase Agreement with Alpine, and that, therefore, the Lease–Purchase Agreement is void and unenforceable against the Yorks. Although the Yorks initially declare that the Lease–Purchase Agreement is void based on MATC's alleged lack of statutory authority, they fail to adequately brief this issue, and ultimately concede that the contract is more accurately deemed as voidable by Alpine. Because the Yorks fail to brief the issue that the Lease–Purchase Agreement is void, we decline to review it, *see Smith v. Four Corners Mental Health Ctr., Inc.,* 2003 UT 23, ¶ 46, 70 P.3d 904, and instead focus on the Yorks' subsequent argument that because MATC lacked authority to enter into the agreement, the Lease–Purchase Agreement is voidable and ultimately unenforceable against the Yorks. We are not, however, persuaded by this argument.

¶ 14 Assuming, without deciding, that the Lease–Purchase Agreement is indeed voidable by Alpine, the Yorks' argument fails because, although a voidable document is capable of being annulled or deemed unenforceable, the validity of the Lease–Purchase Agreement has not been challenged. The Yorks assert only that the Lease–Purchase Agreement is unenforceable as against them due to the alleged voidability of the agreement, and do not purport to challenge the validity of the Lease–Purchase Agreement itself. Therefore, we do not consider whether the Yorks have standing to directly challenge the validity of the agreement. Both of the parties to the Lease–Purchase Agreement—Alpine and MATC—appear to regard the Lease–Purchase Agreement as a valid agreement, and have conducted themselves according to that agreement.[8] As a result, we do not agree with the Yorks that the Lease–Purchase Agreement is unenforceable or void as against them merely because the agreement may be voidable by other parties. *See Miller v. Celebration Mining Co.,* 2001 UT 64, ¶¶ 9–10, 29 P.3d 1231 (discussing which parties may enforce or seek to void a contract). Accordingly, we conclude that the trial court did not err in determining that MATC purchased the property.

## CONCLUSION

¶ 15 The Yorks maintain that MATC's installment purchase of the Property did not trigger a commission under the Listing Agreement because the transaction was completed through a Lease–Purchase Agreement to which the Yorks were not a party. Thus, the Yorks argue that they did not sell the Property to MATC, but rather, they sold the property to Alpine. The trial court looked to the substance of the transaction, not simply to the form of the transaction, and concluded that, although the sale was completed with two separate purchase contracts, it was in effect one transaction, with Yorks as the

---

6. The trial court found that, among Heal's other actions on behalf of the Yorks, it was through Mr. Heal's efforts, expertise, and counsel that the Yorks were able to ask for and obtain $300,000 more for the property than the property's previously listed price of $2,300,000.

7. The Yorks assert that MATC lacked authority because at the time of the purchase MATC was unable to purchase the Property on its own since it did not have the budget for such a capital purchase nor did it have the right, independent of legislative action, to acquire real property.

8. Mr. Brems testified at trial that MATC continues to make monthly payments to Alpine.

seller, Alpine as the financier, and MATC as the purchaser.

¶ 16 A review of the transaction supports the trial court's conclusion that the Yorks sold the Property to MATC. Specifically, MATC negotiated the terms of the purchase, located a financier, entered into a Lease–Purchase Agreement to facilitate the purchase, arranged and paid for an appraisal, contributed approximately $620,000 toward the down payment, and received equitable title to the Property. Likewise, Alpine, consistent with its role as financier, memorialized the terms of the financing agreement by executing the Lease–Purchase Agreement with MATC and thereafter advanced the funds and closed on the Property without exercising an interest or possessory right in the Property.

¶ 17 Additionally, the Lease–Purchase Agreement currently in force is not unenforceable as against the Yorks merely because it may be voidable by other parties. Thus, we conclude that the trial court did not err in determining that the substance of the parties' transaction was indeed a purchase by a tenant that triggered the commission clause in the Listing Agreement. Accordingly, we affirm.

¶ 18 I CONCUR: CAROLYN B. McHUGH, Judge.

¶ 19 I CONCUR, EXCEPT THAT AS TO SECTION II, I CONCUR ONLY IN THE RESULT: GREGORY K. ORME, JUDGE.