**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 21, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ULTRA CLEAN HOLDINGS, INC.,

      Plaintiff-Appellee,

v.

TFG-CALIFORNIA, L.P., a Utah limited
partnership and TETRA FINANCIAL
GROUP, L.L.C., a Utah limited
partnership,

      Defendants-Appellants.

No. 11-4175
(D.C. No. 2:09-CV-00904-CW)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BALDOCK,** and **EBEL**, Circuit Judges.

This is an appeal from the district court's partial grant of summary judgment to

Plaintiff-Appellee Ultra Clean Holdings ("Ultra Clean"). Ultra Clean filed a lawsuit

against Defendants-Appellants TFG-California, L.P. and Tetra Financial Group, L.L.C.,

(collectively, "TFG"), arguing that, when the parties were unable to finalize a sale-

---

      * This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

leaseback transaction,[1] TFG breached a contract between the parties by failing to return a deposit paid by Ultra Clean. Based on the language of the agreement between Ultra Clean and TFG, the district court concluded that Ultra Clean was entitled to have its deposit returned. Because we conclude that the contractual language governing the return of the deposit is ambiguous as a matter of law, we reverse the district court's decision granting summary judgment to Ultra Clean and remand for factual findings.

**BACKGROUND**

Ultra Clean "manufacture[s] . . . critical subsystems for the semiconductor capital equipment, medical devices, research, flat panel, and solar industries." Aplt. App. at 11. TFG "provides lease financing for a large variety of commercial assets." Id. at 130. In late 2008, the parties began negotiating a sale-leaseback arrangement, whereby TFG would procure financing and purchase certain equipment owned by Ultra Clean and then lease that equipment back to Ultra Clean. Initially, the parties contemplated TFG providing financing of up to $7.5 million for a thirty-six-month term of lease. The parties later agreed to reduce the financing amount to $4.8 million and the lease term to twenty-four months.

In December 2008, Ultra Clean presented TFG with a Letter of Intent ("LOI"), which states: "It is the intent of Lessee [Ultra Clean] to formally offer to Lessor [TFG] to

---

[1] This contemplated transaction involved TFG purchasing equipment owned by Ultra Clean and leasing it back to Ultra Clean over a multiple-year lease term.

lease the Leased Property from Lessor [TFG] pursuant to the following terms and

conditions (the 'Proposal')." Aplt. App. at 17. The LOI then proceeds to set forth some

material terms and conditions of this offer. As relevant to this appeal, a provision of the

LOI entitled "Acceptance By Lessor" contains the following language:

> This Proposal constitutes an offer by Lessee to lease from Lessor the
> Leased Property on the terms and conditions set forth herein and shall be
> binding only upon Lessor's acceptance. Upon Lessor's acceptance, this
> Proposal shall supersede all prior understandings among the parties hereto.
> Further, upon execution of the Master Lease Agreement and any applicable
> Schedule(s) and such other ancillary agreements and instruments thereto,
> the Master Lease Agreement shall supersede this Proposal in all respects.

Id. at 19.

The parties' dispute centers around the meaning of certain terms contained in

another provision of the LOI, which is entitled "Reliance on Commitment." This

provision states:

> Prior to issuing a commitment, the Lessor will perform additional due
> diligence in connection with the Lease and will initiate such due diligence
> upon receipt from Lessee of a deposit in an amount equal to $25,000.00
> which is equal to one-half the Base Monthly Rental (the "Initial Deposit").
> Upon final credit approval, Lessee will provide the remaining deposit
> amount of $188,000.00 within 5 business days. Said deposit will then total
> 1 full Base Monthly Rental.[2] This Proposal shall be firm and irrevocable for

---

[2] We note that the LOI required Ultra Clean to pay a total deposit of $213,000—the
$25,000 plus $188,000—but TFG explains in its brief that "[t]he original deposit amount
of $213,000 was reduced to $173,321.75 to account for the reduction in the funding
amount from $7.5 million to $4.8 million." Aplt. Br. at 13 n.4.

Of the $213, 000 deposit contemplated under the LOI, the Reliance on Commitment
Provision defined the Initial Deposit to be only $25,000. Aplt. App. at 19 (requiring
Ultra Clean to to pay "a deposit in an amount equal to $25,000.00 which is equal to one-

Continued . . .

thirty (30) business days from the date of <u>receipt by Lessor of all documentation and information required by Lessor</u> (the "Review Period."). If Lessor does not accept this Proposal within the Review Period and Lessee revokes this Proposal in writing, Lessee's Initial Deposit will be returned, without interest. If Lessor <u>accepts this Proposal</u> within the Review Period, the Initial Deposit shall become nonrefundable . . . [and] shall either (i) be applied as a prepayment of the final Base Monthly Rental payment, or (ii) if Lessee does not enter into the lease for any reason, the Initial Deposit shall be deemed a processing fee fully earned by Lessor, and not a penalty, as consideration of and liquidated damages for Lessor's time, effort and expense in considering and responding to Lessee's Proposal.

<u>Id.</u> at 19 (emphases added). The parties disagree about whether TFG accepted the Proposal within the Review Period. In other words, they dispute the meaning of the phrases "accept this Proposal" and "receipt by Lessor of all documentation and information required by Lessor."

On December 8, 2008, the parties executed the LOI. At that time, Ultra Clean made an initial payment of the deposit in the amount of $25,000.

---

half the Base Monthly Rental (the 'Initial Deposit')"). And the language of the Reliance on Commitment Provision that explains when funds will be returned to Ultra Clean speaks <u>only </u>of the Initial Deposit. <u>Id.</u> ("If Lessor does not accept this Proposal within the Review Period and Lessee revokes this Proposal in writing, Lessee's Initial Deposit will be returned, without interest. If Lessor accepts this Proposal within the Review Period, the Initial Deposit shall become nonrefundable . . . ."). Thus, under the plain language of the LOI, the dispute between the parties involving whether the Initial Deposit should be refunded is only a dispute of $25,000.

But the district court awarded Ultra Clean $173,321.75—the full deposit paid by Ultra Clean to TFG. And on appeal, TFG does not challenge the amount of the award; it only argues that the district court erred in granting summary judgment to Ultra Clean. Thus, we will assume for purposes of this appeal that the amount in question is the total deposit paid by Ultra Clean—$173,321.75.

As is next relevant to this appeal, after TFG commenced its due diligence and underwriting, in late December, the parties agreed in writing to an amendment to proposed transaction ("Amendment"), whereby they reduced the amount of funding, modified the lease term, and agreed that Ultra Clean would provide a security deposit of 15% of the cost of the equipment. This written agreement stated that "[a]ll other terms and conditions of the initial proposal dated December 8, 2008 would remain the same." Id. at 22.

On January 21, 2009, TFG made an arrangement with Republic Bank (not a party to this action) to obtain funding for the sale-leaseback transaction contemplated between TFG and Ultra Clean. Republic Bank agreed with TFG to fund the proposed transaction under the terms described in the LOI and the Amendment. A few days later, Republic Bank confirmed in writing its commitment to fund the transaction. Its agreement with TFG was to remain in effect for ninety days.

Having obtained funding from Republic Bank, TFG informed Ultra Clean on January 21, 2009, verbally and in writing, that it had granted "final credit approval" for the transaction. Id. at 210. TFG sent standard lease documents to Ultra Clean on January 28, 2009. But Ultra Clean did not immediately sign and return the lease documents; instead, it continued to negotiate with TFG. Although TFG informed Ultra Clean that the credit approval for the funds was only good for ninety days, Ultra Clean delayed signing lease documents until after the ninety day period had elapsed.

5

During the delay, Ultra Clean's financial condition deteriorated. On April 15, 2009, Republic Bank informed TFG that it would not agree to fund the transaction until after Ultra Clean released its financial statement for the quarter. And on April 21, 2009, Republic Bank's credit approval to TFG for the transaction expired.

Finally, TFG sent revised lease documents to Ultra Clean.[3] And on April 28, 2009, Ultra Clean signed the lease documents and returned them to TFG, along with an authorization that allowed TFG to directly withdraw funds from Ultra Clean's bank account. Pursuant to Ultra Clean's authorization, on May 5, 2009, TFG withdrew $145,712.50 from Ultra Clean's bank account. And on May 11, 2009, TFG withdrew an additional $2,609.25 from Ultra Clean's account. These amounts, combined with the initial payment of $25,000, brought the amount Ultra Clean paid to TFG to $173,321.75.[4]

Despite withdrawing these funds from Ultra Clean's account, TFG never signed the lease documents that had previously been executed by Ultra Clean. Instead, on May 12, 2009, TFG learned that Republic Bank was no longer willing to fund the lease under

---

[3] Although the timing is not clear from the parties' briefs, it appears that at some point, TFG sent to Ultra Clean lease documents that had been revised in accordance with the parties' negotiations, and Ultra Clean executed this second set of lease documents rather than the first set of documents sent on January 21, 2009.

[4] The Reliance on Commitment Provision of the LOI called for an initial payment of $25,000, with an additional payment of $188,000 (subsequently reduced to $173,321.75) to be paid within five business days of final credit approval for the transaction. Although Ultra Clean did not make its payment for the remainder of the deposit within five days of receiving final credit approval, the district court found that TFG had waived this requirement, and TFG does not appeal this ruling.

the terms that TFG and Republic Bank had previously discussed. As a result, TFG later sent Ultra Clean revised lease documents that increased the amount of the security deposit from 15% of the cost of the equipment to 40% of the cost. Ultra Clean responded by revoking the Proposal in writing.

TFG did not return Ultra Clean's deposit. Accordingly, Ultra Clean sued TFG, claiming that TFG had breached the LOI by failing to return the deposit. The parties filed cross-motions for summary judgment. The district court granted summary judgment to Ultra Clean on the breach of contract claim and denied TFG's cross-motion for summary judgment. TFG has timely appealed the district court's ruling.

## JURISDICTION

The district court had jurisdiction over this case under 28 U.S.C § 1332(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

Summary judgment is available "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir. 2005). But "[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." Buell Cabinet Co., Inc. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979). And "[w]hen the parties file cross motions for summary judgment, [the court is]

7

entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).

In the context of summary judgment, "[t]he initial question . . . concerning the existence of an ambiguity [in a contract] is one of law that may be decided summarily by the court." Gomez v. Am. Elec. Power Serv. Corp., 726 F.2d 649, 651 (10th Cir. 1984). And "[i]f the language is clear, the parties' intentions are not at issue." Id. But "the question concerning the interpretation of a written agreement is one of fact." Id. "Thus, in an ambiguous contract, if the intent of the parties is disputed, a genuine issue of material fact exists which cannot be determined summarily by the court." Id.; accord WebBank v. Am. Gen. Annuity Serv. Corp., 54 P.3d 1139, 1145 (Utah 2002) ("[A] motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended." ). TFG did not argue that the language of the LOI was ambiguous before the district court. But "[w]hether to address [an] argument despite the litigant's failure to raise it below is subject to this court's discretion based on the circumstances of the individual case." United States v. Jarvis, 499 F.3d 1196, 1201 (10th Cir. 2007). Here, although neither party specifically argued before the district court that the language of the LOI was ambiguous, they put forth conflicting interpretations of the language of the LOI,

8

and when faced with conflicting interpretations, the court must determine as a threshold matter if the contractual language is ambiguous. See Gomez, 726 F.2d at 651.

## DISCUSSION

In this case, the LOI states that the "Proposal shall be governed in all respects by the laws of the State of Utah without regard to conflicts of law principals [sic]." Aplt. App. at 20. To determine if contractual language is ambiguous, Utah courts consider whether "it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." WebBank, 54 P.3d at 1145 (internal quotation marks omitted). But "[a] contract provision is not necessarily ambiguous because the parties differ in their interpretation of its language." Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co., 899 P.2d 766, 772 (Utah 1995). Thus, "[t]o demonstrate ambiguity, the contrary positions must each be a reasonable interpretation of the terms in the provision." Id.

Before the district court, Ultra Clean argued that it was entitled to summary judgment because TFG had not accepted the Proposal within the Review Period, and was therefore not entitled to retain the deposit. The district court agreed. But TFG contends, instead, that it did accept the Proposal within the Review Period, and therefore is entitled to retain the deposit. Resolution of the parties' dispute turns on the meaning of two phrases contained in the Reliance on Commitment Provision of the LOI: (1) "accept this Proposal"; and (2) "receipt by Lessor of all documentation and information required by Lessor (the 'Review Period')."

9

We will first set forth the parties' respective interpretations of these contested phrases, and then discuss whether these interpretations are reasonable. We conclude that the interpretations put forth by the parties are equally reasonable; thus, a factual issue exists that precludes summary judgment.

## I.      The Parties' Interpretations

### A.  The District Court Decision & Ultra Clean's Interpretation

The court ruled that TFG did not accept the Proposal within the Review Period.[5] Specifically, the district court concluded that "[TFG] had all of the required documents and information [necessary to trigger the Review Period] by April 28," because that was the date by which the parties had agreed on the final form of the lease documents. Aplt. App. at 288-89. And the district court determined that, "[b]y making a counter proposal that changed a material term of Ultra Clean's offer, [TFG] rejected Ultra Clean's offer," and "Ultra Clean responded to the counterproposal by revoking the Proposal in writing." Id. at 289.

Ultra Clean agrees. Ultra Clean claims that the Review Period was intended to give TFG an opportunity to review the final lease documents before executing them and

_____

[5] The district court ruled that "[t]he Proposal was therefore irrevocable for the following 30-day 'Review Period' that ended on May 28," and that TFG did not accept the Proposal within the Review Period. Aplt. App.at 289. But the LOI provided that only business days were to be included in the thirty-day Review Period, Aplt. App. at 19; thus, under the district court's interpretation, the Review Period would actually have been from April 28, 2009 to June 10, 2009.

10

entering into the lease transaction. Thus, it interprets the phrase "all documentation and information required by Lessor" to mean all documents necessary to finalize the transaction and enter into a lease agreement—including the final lease documents. And it contends that to "accept this Proposal," TFG was required to enter into the sale-leaseback transaction with Ultra Clean by executing the lease documents. From this, although Ultra Clean's arguments on this point are unclear, it seems evident that Ultra Clean must consider the term "Proposal" to mean the executed final lease documents that it sent to TFG (which had previously been drafted by TFG and sent to Ultra Clean for execution).[6] Under Ultra Clean's interpretation, TFG did not accept the Proposal during the Review Period, because it did not execute the final lease documents during the thirty business days between April 28, 2009 and June 10, 2009.

## B. TFG's Interpretation

In contrast, TFG contends that the Proposal was a preliminary agreement between the parties, rather than the ultimate sale-leaseback transaction entered into by the final lease documents. In other words, it asserts that the overall transaction between the parties involved two separate agreements—the Proposal (under which Ultra Clean would keep

---

[6] It is not really clear how Ultra Clean would define the term "Proposal." Ultra Clean claims that the "Proposal" was "Ultra Clean's offer to lease certain property from TFG," but does not point to a specific document that constitutes the Proposal. Nonetheless, given Ultra Clean's arguments that TFG must execute the final lease documents to accept, Ultra Clean appears to consider the final lease documents that it executed and sent to TFG to be the Proposal.

11

its offer firm and irrevocable, and TFG would undertake due diligence and underwriting in an attempt to secure funding for the lease), and the Master Lease (under which the parties would enter into the sale-leaseback transaction). Although this is the overall thrust of TFG's argument, it advances multiple possible interpretations of the phrases "accept this Proposal" and "receipt by Lessor of all documentation and information required by Lessor."

TFG claims that the Review Period was intended to give it an opportunity to review the documentation and information necessary to conduct due diligence and underwriting, and determine whether it could fund the transaction. Thus, it argues that the "documentation and information" necessary to trigger the Review Period is the material necessary for TFG to perform its due diligence and underwriting prior to issuing funding for the transaction. TFG further argues that it would not make sense to have the Review Period commence until the finalization of the lease documents, because at that point, TFG would have completed its review and already made the decision to approve the transaction.

Under this interpretation, the LOI provided that TFG would "initiate [its] due diligence upon receipt from [Ultra Clean] of a deposit in an amount equal to $25,000," Aplt. App. at 19, and Ultra Clean made that deposit of $25,000 on December 8, 2008, so it is possible that, as of that date, TFG had received all the materials it required to begin its due diligence and underwriting, making the Review Period from December 8, 2009 to January 22, 2010. But TFG also points to the Amendment the parties executed in late

12

December, and if this was part of the documentation and information required by TFG, the Review Period would run from December 30, 2008 to February 12, 2009. Further, TFG asserts that because it "issued its final credit approval on January 21st," it "must have received all of the due diligence 'documentation and information' prior to that date," Aplt. Br at 21, which means the very latest possible dates for the Review Period would have been January 21, 2009 to March 5, 2009.

TFG claims that it accepted the Proposal by executing the LOI or by issuing final credit approval for the transaction. TFG's arguments indicate that it appears to define the Proposal as the LOI or the Amendment executed in late December. Under TFG's proffered interpretations, if the Review Period began on December 8, 2009, TFG accepted the Proposal by executing the LOI or granting final credit approval. If the Review Period began December 30 or January 21, TFG accepted the Proposal by granting final credit approval.

## II.     Reasonableness of the Parties' Interpretations

Although each party's proffered interpretations contain significant flaws, in light of the language contained in the LOI, we conclude that the parties put forth contrary interpretations that were equally reasonable. Thus, the contract is ambiguous and a dispute of material fact exists that precludes summary judgment. We will consider each phrase in turn.

First, in determining the proper interpretation of the phrase "accept this Proposal" it is not at all clear from the LOI what is meant by the term "Proposal"—whether the

13

Proposal is the LOI, the Amendment, the final lease documents, or something else altogether. And the language of the LOI does not clarify this problem. For instance, some language supports Ultra Clean's argument that TFG was required to do something more than execute the LOI to accept the Proposal. The LOI states that "[p]rior to issuing a commitment, Lessor will perform additional due diligence." Id. (emphasis added). But this language does not preclude TFG's argument that it accepted the Proposal by issuing final credit approval. Nonetheless, the LOI also states that "[t]his Proposal constitutes an offer by Lessee to lease from Lessor the Leased Property on the terms and conditions set forth herein and shall be binding only upon Lessor's acceptance," Aplt. App. at 19 (emphases added)) which supports Ultra Clean's interpretation of the Proposal as the final lease agreement.

In support of TFG's position, there is also language indicating that the Proposal is the LOI itself. For instance, the LOI defines "the following terms and conditions" of the LOI as "the 'Proposal,'" Aplt. App. at 17, and the LOI refers to "this Proposal" throughout the document. Id.; see also Aplt. App. at 19 ("[T]his Proposal shall supersede all prior understandings among the parties," but "the Master Lease Agreement shall supersede this Proposal in all respects." (emphasis added)); id. ("If Lessor [TFG] accepts this Proposal in writing, the Initial Deposit shall become nonrefundable," and "if Lessee [Ultra Clean] does not enter into the lease for any reason, the Initial Deposit shall be deemed a processing fee." (emphases added)). Such language clearly differentiates between the Proposal and the final lease agreement, and supports the notion that TFG

14

could accept the Proposal by executing the LOI or approving funding for the transaction, rather than executing final lease documents.

Similarly, there is also language indicating that the Amendment that the parties executed in late December constitutes the Proposal. The Amendment made changes to material terms by shortening the lease and requiring Ultra Clean to provide a 15% security when no security had previously been required. And the Amendment stated that "[a]ll other terms and conditions of the initial proposal dated December 8, 2008 would remain the same." Aplt. App. at 22. The parties' executing this Amendment indicates that it is reasonable that this Amendment then became the governing document.

Second, in determining the proper interpretation of the phrase "receipt by Lessor of all documentation and information required by Lessor," language from the LOI again supports each party's interpretation. As Ultra Clean points out, the phrase "all documentation and information required by Lessor," Aplt. App. at 19 (emphasis added), is not limited only to the documentation and information necessary for TFG to conduct its due diligence, and therefore could reasonably be read to refer to all documents necessary to complete the sale-leaseback transaction.

On the other hand, the Reliance on Commitment provision first states "[TFG] will perform additional due diligence in connection with the Lease and will initiate such due diligence upon receipt from [Ultra Clean] of a deposit in an amount equal to $25,000," and then states that "[t]his Proposal shall be firm and irrevocable for thirty (30) business days from receipt by Lessor of all documentation and information required by Lessor."

15

Aplt. App. at 19. This indicates that the "documentation and information" refers to material necessary for TFG to conduct due diligence and underwriting, rather than the material necessary to finalize the sale-leaseback transaction. Additionally, the provision following the Reliance on Commitment Provision is entitled "Financial Information," and states that "[Ultra Clean] will provide audited financial statements and other business and financial information required by Lessor." Aplt. App. at 19. This indicates that the prior provision, Reliance on Commitment, could be referring to financial materials rather than lease documents.

In addition to the plain language of the contract, the parties each presented the district court with arguments and evidence supporting the reasonableness of their respective positions. Because Ultra Clean and TFG advance contrary reasonable interpretations, the contract is ambiguous as a matter of law and factual findings are necessary to discern the intent of the parties. See WebBank, 54 P.3d at 1147 ("Such ambiguity may be resolved only by the trier of fact after consideration of parol or extrinsic evidence as to the parties' intentions, that is, a review and evaluation of all the facts and circumstances surrounding the substance of the transaction.").

## CONCLUSION

Ultra Clean and TFG advance contrary interpretations of key language contained in the LOI. Both parties' interpretations are reasonable in light of the plain language of the LOI and the record before the court. Accordingly, under Utah law, the provisions are ambiguous and a genuine dispute of material fact exists. For that reason, summary

16

judgment was inappropriate.  Accordingly, we reverse the district court's decision granting summary judgment to Ultra Clean and remand for factual findings.

REVERSED.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge