**2016 UT App 140**

## THE UTAH COURT OF APPEALS

JENCO LC, DEAN GARDNER INVESTMENT LC, AND F.M. SNOW
PROPERTIES LLC,
Appellees,
*v.*
PERKINS COIE LLP,
Appellant.

Opinion
No. 20140996-CA
Filed July 8, 2016

Fifth District Court, St. George Department
The Honorable Jeffrey C. Wilcox
No. 120500458

James L. Ahlstrom and Barry Stratford, Attorneys
for Appellant

Bryan J. Pattison, Attorney for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which JUDGES
STEPHEN L. ROTH and KATE A. TOOMEY concurred.

ORME, Judge:

¶1      Appellees JENCO LC, Dean Gardner Investment LC, and
F.M. Snow Properties LLC (collectively JENCO) entered into an
agreement with Ledges Partners LLC (Ledges) in which Ledges
agreed to purchase certain real property from JENCO. After
Ledges defaulted on this agreement, JENCO sought judicial
foreclosure of its trust deed given as security for Ledges'
performance of its obligations. Ledges, which is not a party to
this appeal, did not contest the foreclosure proceeding, and a
default judgment was entered against it. Appellant Perkins Coie
LLP (Perkins)—a law firm that had done work for Ledges and
that held a junior lien on the same property—was named a
defendant and answered JENCO's foreclosure complaint. After

both JENCO and Perkins moved for summary judgment, the district court ruled against Perkins and granted summary judgment to JENCO. Perkins appeals from this adverse decision. We affirm.

BACKGROUND

¶2    In March 2004, JENCO and Ledges entered into an agreement (the Option Agreement) that reserved to Ledges an option to purchase certain real property that it intended to resell.[1] The Option Agreement included a formula by which Ledges agreed to pay JENCO "for the Purchased Property." Importantly, the Option Agreement defined the capitalized term "Minimum Payment" as "[t]he amount calculated by multiplying the number of acres (or partial acres) in the Purchased Property by Forty Thousand Dollars." The Option Agreement also required Ledges to "execute and deliver [to JENCO] . . . [a] Note and [a] Trust Deed encumbering the Purchased Property."

¶3    In October 2005, Ledges exercised its option to begin purchasing property from JENCO. In accordance with the Option Agreement, Ledges executed a promissory note (the JENCO Note), which provided that upon default "the entire unpaid principal balance of [this] Note, [shall] . . . become due and payable." The JENCO Note further provided that, in the event of default, all acquired but as-yet undeveloped and unsold property—property that the Option Agreement defined as "Bulk Property"—was to be appraised for fair market value and deemed sold at that price, with the balance due on the JENCO Note to be adjusted accordingly. The trust deed required Ledges

---

1. Ledges' plan was to develop the property and sell lots, but it also contemplated reselling undeveloped property. This appeal deals only with undeveloped property, referred to by the parties as "Bulk Property."

"[t]o pay . . . all taxes and assessments affecting" the acquired property.

¶4     Nearly five years later, in July 2010, the parties signed both an amendment to the Option Agreement (First Amendment) and a Settlement Agreement,[2] the latter being intended to settle, as explained by JENCO in its brief, "the various defaults that Ledges . . . had accumulated over the preceding five years." The First Amendment modified the payment provision of the Option Agreement.[3] Specifically, section 4 of the First Amendment provided—and the underlining is in the document—that Ledges'

> sole obligation to make payments to [JENCO] with respect to [acquired] Property shall be limited to: (i) the specific Percentage Payments stipulated in . . . <u>Section 4</u>, which amounts are payable upon the sale of the property; [and] (ii) such payment obligations as shall arise as a result of [JENCO's] exercise of its enforcement rights under the Trust Deeds . . . .

Section 4 obligated Ledges, for each resale of Bulk Property, to make a "Percentage Payment," defined as "the Minimum Payment allocable to any Bulk Property, plus 25% of the excess

---

2. Both Perkins's and JENCO's briefs on appeal state that the First Amendment and the Settlement Agreement were both signed on July 15, 2010.

3. We refer to the Option Agreement, as amended by the First Amendment, as the "Amended Option Agreement."

Selling Price above an amount equal to the Minimum Payment attributable to such sale."[4]

¶5     The Settlement Agreement also addressed the payment scheme, outlined in the Amended Option Agreement. Section 3(d) of the Settlement Agreement provided that "Ledges has paid all minimum payments due to [JENCO] under the Amended Option Agreement, and no additional minimum payments will be required thereunder." Section 3(e) of the Settlement Agreement further clarified that "[t]he only amounts that will be payable to [JENCO] with respect to properties previously acquired from [JENCO] under the Amended Option Agreement are the amounts specifically stipulated in the First Amendment, including the cost of collection thereof[.]"

¶6     As Ledges struggled to pay JENCO, it also fell behind on its payments due Perkins. As a result, Ledges granted Perkins a promissory note (the Perkins Note) secured by a Deed of Trust. Both the Perkins Note and the Deed of Trust were executed on July 15, 2010—the same day that the First Amendment and Settlement Agreement were signed. *See supra* note 2. Once the Deed of Trust in favor of Perkins was recorded, Perkins held a lien on the Purchased Property junior to JENCO's trust deed.

¶7     Apparently unbeknownst to JENCO and not mentioned in the Settlement Agreement, between 2007 and 2011 Ledges had failed to pay any of the property taxes assessed against the Purchased Property. As a result, in April 2012 JENCO was

---

4. The Settlement Agreement confirms that these capitalized terms were used as defined in the Option Agreement. Thus, as explained above, a Minimum Payment equals $40,000 per acre. *See supra* ¶ 2. The "Selling Price" is defined as "[t]he gross purchase price which a buyer pays in an arms-length transaction, before deducting any real estate commissions or closing costs."

forced to pay the delinquent property taxes, penalties, and interest owed on the property to avoid a tax sale. Given Ledges' default on its obligation to pay the taxes, JENCO elected to accelerate all amounts due under the JENCO Note and exercised its right to foreclose on the property.

¶8     Just over six months later, in November 2012, the manager of Ledges contacted JENCO and disclosed that Ledges was in negotiations with a proposed buyer. Perkins concedes that in the course of this discussion, JENCO informed Ledges that "to get a payoff amount for the [JENCO] Note, [JENCO] would need specific acreage on what portions of the . . . Property Ledges was planning to sell, and [JENCO] also gave a rough estimate of $832,000 as a Minimum Payment."[5] JENCO informed Ledges that other sums would need to be added to this amount, namely $197,000 as the 25% payment called for in the First Amendment, the now-paid property taxes, default interest, and attorney fees. Ledges did not challenge the payoff amount or any of its components but asked only for a waiver of the default interest. After the proposed sale fell through, JENCO continued the foreclosure action. Perkins, as a junior lienholder on the Purchased Property, was the only party to respond to JENCO's complaint, and a default judgment was entered against Ledges in February 2013.

¶9     Approximately a year and a half later, and two years after discovery opened, Perkins moved for summary judgment on the ground that through the Settlement Agreement, JENCO affirmatively waived its right to receive the contractual "Minimum Payment." JENCO disputed Perkins's interpretation

---

5. The $832,000 estimate was apparently calculated using the Minimum Payment formula found in the Option Agreement and the acreage JENCO estimated was included in the proposed sale. *See supra* ¶ 2.

and filed a cross-motion for summary judgment, which the district court ultimately granted. This appeal followed.

ANALYSIS

¶10  When reviewing a grant of summary judgment, "[a]n appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted). *See also* Utah R. Civ. P. 56(c) (explaining that summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law").[6] Such review considers, "in addition to whether there is any genuine issue as to any material fact, whether the movant is entitled to judgment as a matter of law." *Stevensen v. Goodson*, 924 P.2d 339, 350 (Utah 1996). In the course of our review, "we grant no deference to the district court's legal conclusions." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 19, 116 P.3d 323 (citation and internal quotation marks omitted).

I. The Plain Language of the First Amendment, in Conjunction with the Settlement Agreement, Unambiguously Supports JENCO's Interpretation and Precludes Perkins's Interpretation.

¶11  "The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract." *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139. Furthermore, "we consider each contract provision . . . in relation to all of the others, with a view toward

_____

6. Rule 56 was reorganized effective May 1, 2016. The former rule 56(c) is now rule 56(a). We refer in this opinion to the rule as written at the time the district court granted JENCO's motion.

giving effect to all and ignoring none." *Id.* ¶ 18 (omission in original) (citation and internal quotation marks omitted). Although extrinsic evidence may be considered in some circumstances, ordinarily "[i]f the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* ¶ 19 (citation and internal quotation marks omitted). "An ambiguity exists where the [contractual] language is reasonably capable of being understood in more than one sense." *Central Florida Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599 (citation and internal quotation marks omitted).

¶12   Taken alone, section 3(d) of the Settlement Agreement might seem to waive JENCO's right to an additional "Minimum Payment." After all, the Settlement Agreement states that "Ledges has paid all minimum payments due to [JENCO] under the Amended Option Agreement, and no additional minimum payments will be required thereunder."[7] Thus, if the Settlement Agreement ended here, we would likely agree that JENCO waived its right to receive a portion of the Percentage Payment defined in the First Amendment—that is, the portion derived from the calculation of the Minimum Payment. Section 3(e) of the Settlement Agreement states, however, with our emphasis, that "[t]he only amounts that will be payable to [JENCO] with

---

7. Although the Settlement Agreement is not a model of clarity with respect to the intended meaning of the term "minimum payments," writing this term in lower case in the Settlement Agreement at least suggests that it has a different meaning than the capitalized term as used in the Option Agreement and the First Amendment, especially because the Settlement Agreement provides that "[c]apitalized term[s] . . . have the meanings given them in the Amended Option Agreement." In any event, given the clarity of section 3(e), it is unnecessary to determine the interpretation and operation of section 3(d) read in isolation.

respect to properties previously acquired from [JENCO] under the Amended Option Agreement *are the amounts specifically stipulated* in the First Amendment." Thus, Perkins's attempt to read out the Minimum Payment provision—itself a part of the "amounts specifically stipulated in the First Amendment"—is unavailing.

¶13    There are several additional points worth noting. First, it is instructive that both the First Amendment and the Settlement Agreement were signed on the same day. *See supra* note 2. It is unlikely that JENCO, having negotiated a favorable term, would agree to have that term rescinded a few minutes later. Second, Ledges, the actual obligor, has never disputed JENCO's calculation of the amount due and owing to JENCO. Third, Perkins's reading of section 3(d) would render section 3(e)—not to mention the payment provisions of the First Amendment— entirely superfluous.[8] We read the contract to say exactly what it unambiguously, if somewhat cumbersomely, expresses: the only

---

8. As the district court correctly observed, "[i]f Ledges . . . and [JENCO] had understood the amount of the Minimum Payment portion to be zero, as Perkins . . . claims, then it makes no sense that they would have included the term 'plus' on top of zero to determine the amount due and payable." Whatever the truth of the stereotype that legal professionals are bad at math, *see* Arden Rowell & Jessica Bragant, *Numeracy and Legal Decision Making*, 46 Ariz. St. L.J. 191, 193 (2014), we assume that all parties to the suit knew that the sum of zero plus any number is equal to that number, *see Properties of Zero*, Basic-Mathematics.com, http://www.basic-mathematics.com/properties-of-zero.html (last visited July 5, 2016) [https://perma.cc/J2TS-AWYK] (noting that "a number does not change when adding or subtracting zero from that number"). Thus, we agree with the district court that the terms of the Settlement Agreement "make[] no sense" if Perkins's interpretation of those terms is adopted.

payments Ledges owes to JENCO are the "amounts specifically stipulated in the First Amendment," i.e., the "Minimum Payment, . . . plus 25% of the excess Selling Price."[9] Because the contract is unambiguous, "the language within the four corners of the contract" makes Perkins's alternative interpretation untenable. *See WebBank*, 2002 UT 88, ¶ 19 (citation and internal quotation marks omitted). Therefore, the district court did not err in interpreting the contract as it did, "as a matter of law." *Id.* (citation and internal quotation marks omitted).

## II. The District Court Properly Considered the Admissible Evidence That Was Presented to It and Did Not Improperly Weigh the Evidence.

¶14 Perkins's main argument, treated above, is that while the key agreements are clear and unambiguous, they should have been interpreted, in Perkins's favor, as a matter of law. Its fallback position is that if the agreements are not interpreted in

---

9. As we read the Settlement Agreement, sections 3(b)–(d) refer primarily to Ledges' settlement of its outstanding dispute with JENCO over certain funds that were placed in escrow to be delivered to JENCO after the sale of several residential lots but that were returned to Ledges instead (the Missed Payment Amount). It would appear, then, that while section 3(d) refers to "all minimum payments due," it is *not* referring to the term "Minimum Payment" as defined in the First Amendment. Instead, it simply means that when the Settlement Agreement was signed, Ledges owed JENCO no payments aside from the Missed Payment Amount. Our reading is bolstered by Ledges' further acknowledgment in section 3(e) that, as future lots were (or were not) sold, it would incur additional liability "with respect to properties previously acquired from [JENCO]." Such liability was to be determined according to the terms of the First Amendment.

the manner Perkins urges, then they were at least ambiguous enough to render summary judgment in JENCO's favor improper.[10] There is nothing illogical with this two-pronged approach. As we previously explained,

> Cross-motions for summary judgment do not ipso facto dissipate factual issues, even though both parties contend . . . that they are entitled to prevail because there are no material issues of fact. Rather, cross-motions may be viewed as involving a contention by each movant that no genuine issue of fact exists under the theory it advances, but not as

_____

10. While Perkins is not responsible for the drafting of the Option Agreement or the JENCO Note and trust deed, Perkins acknowledges that the interpretation of "its own work" is at the heart of this appeal. Thus, although we decide this issue on other grounds, given that Perkins drafted the First Amendment and Settlement Agreement—for its then-client, Ledges— it is peculiar that Perkins now suggests that *its own drafting* is ambiguous. For one thing, clients do not engage lawyers to draft ambiguous contracts, and Perkins should not benefit from ambiguity in its own drafting. Moreover, an ambiguous contract is interpreted against the drafter. *See, e.g.*, *Sears v. Riemersma*, 655 P.2d 1105, 1107 (Utah 1982) ("[A]ny uncertainty with respect to construction of a contract should be resolved against the party who [drafted] the agreement."); *Parks Enters., Inc. v. New Century Realty, Inc.*, 652 P.2d 918, 920 (Utah 1982) ("It is also settled law that a contract will be construed against its drafter."). As the doctrine is regularly applied to a party to a contract, even though it is often that party's counsel who is responsible for drafting the contract, *see Sears*, 655 P.2d at 1107 (applying the doctrine against the party whose *counsel* had drafted the contract), it is even more appropriate to apply it directly against that counsel on the rare occasion when the opportunity presents itself.

a concession that no dispute remains under the theory advanced by its adversary. In effect, each cross-movant implicitly contends that it is entitled to judgment as a matter of law, but that if the court determines otherwise, factual disputes exist which preclude judgment as a matter of law in favor of the other side.

*Wycalis v. Guardian Title*, 780 P.2d 821, 824–25 (Utah Ct. App. 1989) (omission in original) (citations and internal quotation marks omitted). But the alternative argument is unavailing in this case.

¶15    On summary judgment, the district court may neither weigh credibility nor assign weight "to conflicting evidence." *Martin v. Lauder*, 2010 UT App 216, ¶ 14, 239 P.3d 519. Thus, to qualify for summary judgment, a party must demonstrate that no dispute exists concerning material facts. *Id.* ¶¶ 14–15. And while an appellant who is challenging a summary judgment entered against it "is 'entitled to all favorable inferences, [it] is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture.'" *Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, ¶ 7, 264 P.3d 752 (quoting *Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir. 1962)). In essence, "the parties must submit admissible evidence" "[t]o present an issue of material fact," *Ladd*, 2011 UT App 355, ¶ 7, and "unsubstantiated conclusions and opinions are inadmissible," *Martin*, 2010 UT App 216, ¶ 6 n.4 (citation and internal quotation marks omitted).

¶16    As the district court noted, "[t]he facts as set forth [by JENCO were] . . . undisputed." This was true even after two years of discovery, during which Perkins apparently did not turn up any evidence contradicting JENCO's evidence or JENCO's interpretation of the legal effect of that evidence. Indeed, Perkins chose not to depose any of Ledges' executives or employees. In JENCO's words, Perkins "instead stood on its

summary judgment papers without a single sworn statement contradicting or explaining any of Ledges' actions and conduct." And Perkins's contention that Ledges' former executives "might" dispute JENCO's interpretation of the agreements was simply supposition that Perkins could not rely upon to avoid summary judgment in favor of JENCO. *See Ladd*, 2011 UT App 355, ¶ 7; *Martin*, 2010 UT App 216, ¶ 6 n.4. Accordingly, there was no evidence before the district court from which it could have inferred that a dispute of material fact existed that bore on the interpretation of key terms in the agreement *between the parties to the agreement*, and therefore, it properly granted summary judgment to JENCO. *See Evans v. Huber*, 2016 UT App 17, ¶¶ 13–16, 366 P.3d 862 (noting that where a party's "opposition to summary judgment merely rested on allegations in [its] complaint," "failed to refute the facts [as] set forth in [the opposing party's] motion[,] and did not provide or cite any evidentiary support" for its position, the district court was right to conclude that there was no "genuine issue of material fact" and to grant summary judgment to the opposing party).

¶17    Furthermore, as noted, "[t]he underlying purpose in construing or interpreting a contract is to ascertain the intentions *of the parties to the contract.*" *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d 1139 (emphasis added). Perkins is not now, and never has been, a party to the agreements between JENCO and Ledges. Thus, Perkins's "intentions" with respect to those agreements are irrelevant. *See id.*

III. JENCO Is Entitled to Augment Its Judgment with the
Amount of Attorney Fees Reasonably Incurred on Appeal.

¶18    Although no agreement addressing attorney fees exists between JENCO and Perkins, the JENCO Note and trust deed both authorized JENCO to collect attorney fees, among other costs, from Ledges in the event that an enforcement action

proved necessary. The JENCO Note provides, with our emphasis, that Ledges

> shall pay all costs and expenses incurred by [JENCO] in connection with the collection and enforcement of this Note (regardless of the particular nature of such costs and expenses and whether incurred before or after the initiation of suit or before or *after judgment*), including, without limitation, court costs and . . . attorneys' fees and costs.

JENCO thus contends that fees it incurred in connection with the instant appeal are recoverable as against Ledges, and it seeks to have its judgment augmented accordingly. Perkins does not oppose the request in its reply brief, and the request appears to be in order. Accordingly, we remand the case to the district court for the calculation of JENCO's attorney fees reasonably incurred on appeal and augmentation of its judgment as appropriate. *See Department of Soc. Servs. v. Adams*, 806 P.2d 1193, 1197–98 (Utah Ct. App. 1991).

CONCLUSION

¶19　The district court properly granted summary judgment to JENCO. The plain language of the agreements is unambiguous and forecloses Perkins's alternative interpretation. Perkins presented no admissible evidence to the district court disputing the factual context against which the court interpreted the agreement. The court properly accepted the facts JENCO presented as undisputed because Perkins did not dispute them. Accordingly, we affirm the district court's judgment in all respects, remanding to the district court only for the calculation of JENCO's fees reasonably incurred on appeal and for augmentation of its judgment as appropriate.

———————