**2026 UT App 93**

## THE UTAH COURT OF APPEALS

GEOMETWATCH CORPORATION,
Appellant and Cross-appellee,

*v.*

DURHAM JONES & PINEGAR PC AND P. CHRISTIAN ANDERSON,
Appellees and Cross-appellants.

Opinion
No. 20241013-CA
Filed June 11, 2026

Third District Court, Salt Lake Department
The Honorable Patrick Corum
No. 160901770

Peggy Tomsic, James E. Magleby, Adam Alba, and
Yevgen Kovalov, Attorneys for Appellant and
Cross-appellee

Matthew L. Lalli, Jeremy J. Stewart, Cameron J.
Cutler, Scott A. Wiseman, and Benjamin J. Mills,
Attorneys for Appellees and Cross-appellants

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 GeoMetWatch Corporation (GMW) appeals the district court's grant of summary judgment in favor of the law firm Durham Jones & Pinegar PC (Durham Jones) and its attorney P. Christian Anderson. GMW sued, asserting claims for legal malpractice and breach of fiduciary duty after Durham Jones and Anderson allegedly assisted another client, Alan Hall and his related entities (collectively, the Hall Defendants), in usurping GMW's business opportunity to launch weather sensors on satellites. On summary judgment, the district court dismissed the majority of GMW's claims for lost profits based on issue

preclusion arising from prior federal litigation and dismissed a remaining claim for lost business value for lack of evidence regarding causation and damages. We affirm.

BACKGROUND

¶2   GMW was founded in 2008 with the intent of commercializing weather data using sensor technology. The company planned to sell data collected from a sensor called the Sounding and Tracking Observatory for Regional Meteorology (the STORM sensor) in an alliance with the Utah State University Research Foundation (Utah State).

¶3   In 2011, GMW began looking for customers to purchase data that would be gathered by the STORM sensor, but it was unable to secure firm purchase commitments. In 2012, GMW began discussions with AsiaSat, a commercial satellite operator, to host the STORM sensor on one of its satellites. As part of the relationship, GMW and AsiaSat discussed the possibility of AsiaSat helping GMW secure a roughly $170 million loan from the Export-Import Bank (EXIM) to fund development of the project. Because EXIM was structured to provide financing only to international investors, GMW—a domestic corporation— needed to partner with a foreign entity (like AsiaSat) to procure the loan. But because such a large loan would expose AsiaSat to financial liability, AsiaSat needed to limit its risk. This safeguard was accomplished through a "Cooperation Agreement," which GMW and AsiaSat entered in April 2013. The Cooperation Agreement required GMW to provide a guarantee (or "backstop") and a convertible note to mitigate AsiaSat's risk.[1]

---

1. "A convertible note is a debt instrument that is convertible into shares of the issuer's stock at a specified conversion rate." *AG Oncon, LLC v. Ligand Pharms. Inc.*, No. 2018-0556, 2019 WL

(continued…)

¶4    Also in April 2013, GMW entered into a preferred provider agreement with Utah State to build the STORM sensor.[2] The preferred provider agreement required GMW to make significant payments in exchange for Utah State's services.

¶5    By July 2013, it became apparent that GMW would be unable to provide the guarantee to AsiaSat before an agreed-upon deadline of July 31. AsiaSat informed GMW that it would not continue with the loan application to EXIM until it had received the guarantee. Nevertheless, AsiaSat extended the deadline twice, first to September 30 and later to November 30. Thereafter, when GMW failed to produce the guarantee and convertible note as required by the Cooperation Agreement, AsiaSat declined to proceed further.

¶6    Alongside these events was Durham Jones's involvement with GMW. In January 2011, Anderson—who was employed by a different law firm at the time—had entered into an agreement for legal services with GMW, specifically "on matters relating to equity financings and other securities issuances" and "compliance with applicable state and federal securities laws." In September 2013, Anderson joined Durham Jones.

¶7    On November 3, 2013, Alan Hall sent an email to AsiaSat in which he stated that he had learned GMW was in financial trouble and was unable to meet its obligations. Hall offered to step

---

2245976, at *1 (Del. Ch. May 24, 2019), *aff'd*, 224 A.3d 963 (Del. 2020).

2. This agreement was technically made with the Advanced Weather Systems Foundation, a subsidiary of Utah State. For ease of reading and because the Advanced Weather Systems Foundation and Utah State University Research Foundation are both associated with Utah State University, we refer to the two entities together as "Utah State."

in and "build a new firm" to oversee the construction of the STORM sensor, "aggressively land scores of new clients," and "raise funds" to "ultimately create a multi-billion dollar enterprise." To pursue this opportunity, Hall asked AsiaSat to make a $30 million investment in the new firm in exchange for a 42% share in it. Anderson was copied on the email and did not share its content with GMW. But a little over a week later—on November 12—Durham Jones sent GMW a letter entitled "Waiver of Conflict of Interest." It stated,

> We understand that GMW is now in discussions with Hall concerning a potential business transaction (the "Transaction"). It has been proposed that [Durham Jones] represent Hall exclusively in connection with the Transaction, and both GMW and Hall have orally approved this arrangement.
>
> . . . Therefore, [Durham Jones] is requesting that you consent to [Durham Jones's] representation of Hall in connection with the Transaction (notwithstanding [Durham Jones's] continuing representation of both GMW and Hall in connection with other unrelated matters) and waive any conflict of interest that might arise as a result of such representation.

GMW signed and returned the waiver on November 18. Unbeknownst to GMW, Anderson had begun representing Hall regarding his potential transaction with GMW in the previous month.

¶8    In January 2014, GMW failed to pay Utah State roughly $5.4 million that it was required to remit under the preferred provider agreement. Utah State subsequently terminated the preferred provider agreement when GMW did not cure its default.

¶9 On April 24, 2014, Anderson sent a letter to GMW stating, "[O]ur files (which related to selected corporate matters as assigned by [GMW]) with respect to representation of [GMW] have been closed, and I am sending this letter to confirm that I and my firm, [Durham Jones], no longer serve as legal counsel or provide other services for [GMW] with respect to any matters." The letter also noted that Durham Jones "last performed services for [GMW] on January 27, 2014." The next day, the Hall Defendants, represented by Durham Jones, filed a lawsuit against GMW, which was later consolidated into a lawsuit that GMW filed in May 2014 in federal court (the Federal Action). In the Federal Action, GMW contended that "all its failures to move forward with AsiaSat—and, consequently, the potential profits it lost—[were] attributable to the bad acts of the Hall Defendants, with the remaining [defendants associated with Utah State] conspiring with them to ensure GMW's downfall." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1195 (10th Cir. 2022). But the ultimate decision in the Federal Action determined that the cause of GMW's damages was GMW itself:

> GMW leaves undisputed the facts that establish that it was its *own* failures—occurring even before the Hall Defendants arrived—that destroyed its own venture. Significantly, GMW's venture was already on life-support when [Hall's] inflammatory November 3, 2013, email was sent. At that point in the chronology of events, AsiaSat had twice extended the conditions precedent necessary for the deal to push through. That remains undisputed, and the idea that [Hall] was to blame for AsiaSat finally pulling the plug on the deal remains unfounded.

*Id.* at 1222. In affirming the federal district court's grant of summary judgment to the Hall Defendants and Utah State, the Tenth Circuit concluded, "The record and the facts themselves surely indicate it was GMW's inability to satisfy the Cooperation

Agreement that was the cause of any of its lost profits from the failed venture. And GMW did not proffer any contradictory evidence against those facts." *Id.* at 1190, 1222.

¶10 In March 2016—while the Federal Action was still pending—GMW filed the case against Durham Jones and Anderson that gives rise to this appeal. In its complaint, GMW summarized the harm it alleged to have suffered as follows:

> In a shocking betrayal of trust and confidence, Anderson and Durham Jones breached their duties to their client, [GMW], by aiding another group of clients, [the Hall Defendants], to misappropriate [GMW's] promising, revolutionary, and well-developed business opportunity. Worse, Anderson and Durham Jones actively concealed their unfaithfulness and, in so doing, prevented [GMW] from discovering or mitigating its injury until it was too late. Indeed, as a consequence of Anderson and Durham Jones's malfeasance, [GMW] lost its opportunity and gained a direct competitor, suffering damages in the hundreds of millions of dollars. Anderson and Durham Jones simply decided that one group of clients was more desirable than [GMW]. However, the law does not permit such double-dealing by lawyers.

¶11 GMW offered four "causation and damages scenarios" to account for the alleged harm it suffered. The first three were predicated on lost profits, while the fourth was grounded in lost business value:

- **Scenario 1**: "The [STORM sensor] is built by [Utah State], [AsiaSat] provides an equity investment and project support as reflected in the Cooperation Agreement, and [EXIM] provides financing based upon AsiaSat's pledge of its balance sheet, which AsiaSat conditioned upon an acceptable backstop

to mitigate the financial risk associated with the [STORM sensor]."

- **Scenario 2**: "The [STORM sensor] is built by [an alternate manufacturer], AsiaSat provides an equity investment and project support as reflected in the Cooperation Agreement, and EXIM provides financing based upon AsiaSat's pledge of its balance sheet, which AsiaSat conditioned upon an acceptable backstop to mitigate the financial risk associated with the [STORM sensor]."

- **Scenario 3**: "The [STORM sensor] is built by [an alternate manufacturer], AsiaSat's payload hosting services are replaced by a different commercial satellite operator . . . , and new equity and debt are obtained from the marketplace, including possibly through EXIM project financing . . . or through another export credit agency."[3]

- **Scenario 4**: GMW also presented "an alternate damages scenario" that—unlike the other three scenarios—was "*not* a 'lost profits' theory" but was "based upon a valuation/damages theory predicated on the lost business value of [GMW] at the time that [GMW's] business was destroyed."

¶12    The district court granted summary judgment in favor of Durham Jones and Anderson in two phases. First, it dismissed the three lost-profits scenarios on the basis of issue preclusion arising from the Federal Action. The district court later dismissed the fourth scenario based on GMW's failure to offer nonspeculative evidence of either causation or damages.

---

3. GMW divided Scenario 3 into Scenario 3a and Scenario 3b, with the financing in Scenario 3a coming by way of equity investment and the financing in Scenario 3b being obtained from commercial lenders.

ISSUES AND STANDARD OF REVIEW

¶13    GMW appeals, first asserting that the district court erred in granting summary judgment against GMW on its lost profits claims based on the doctrine of issue preclusion. GMW next claims that the district court erred in granting summary judgment against GMW due to GMW's failure to offer nonspeculative evidence of causation and damages based on lost business value.[4] "Summary judgment is appropriate where the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Appellate courts review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 14, 423 P.3d 1150 (cleaned up).

ANALYSIS

I. Issue Preclusion on Causation

¶14    GMW contends the district court erred in applying issue preclusion, claiming that Durham Jones and Anderson's specific duties and conduct were not adjudicated in the Federal Action. We disagree.

¶15    Issue preclusion applies when the *issue* decided in the prior adjudication is identical to the one presented in the instant action. As this court has stated, "Issue preclusion, often referred to as collateral estoppel, prevents relitigation of issues already determined in a previous action. In effect, once a party has had his

---

4. Durham Jones and Anderson also bring a conditional cross-appeal, but we have no occasion to reach it given our resolution of the two claims of error brought by GMW.

or her day in court and lost, he or she does not get a second chance to prevail on the same issues." *Heywood v. Department of Com.*, 2017 UT App 234, ¶ 25, 414 P.3d 517 (cleaned up). Four criteria must be met for the application of the doctrine:

> (i) the party against whom issue preclusion is asserted must have been a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication must be identical to the one presented in the instant action; (iii) the issue in the first action must have been completely, fully, and fairly litigated; and (iv) the first suit must have resulted in a final judgment on the merits.

*Haskell v. Wakefield & Assocs. Inc.*, 2021 UT App 123, ¶ 22, 500 P.3d 950 (cleaned up).

¶16    GMW challenges only the district court's conclusion on the second criterion—whether the issue in the Federal Action is identical to the issues related to lost profits presented in the state court action. GMW's claim in the Federal Action was that the actions of the Hall Defendants caused GMW's lost profits. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1189, 1195 (10th Cir. 2022). The federal district court had granted partial summary judgment in favor of the Hall Defendants in the Federal Action because there was "insufficient evidence as to causation." *Id.* at 1198. The federal district court had reasoned,

> Independent of anything the Hall Defendants did, GMW was unable to perform under the Cooperation Agreement. GMW was not able to obtain a sufficient backstop, and GMW was unable to provide AsiaSat with a convertible note. As a result, AsiaSat refused to undertake the loan process and GMW was unable to obtain the funds it needed. Consequently, GMW was unable to pay [Utah State] to build the STORM sensor.

*Id.* (cleaned up). Thus, the core issue in the Federal Action was the cause of GMW's alleged damages. There, it was conclusively determined that "GMW's venture was already on life-support" when the Hall Defendants engaged in the bad acts that allegedly harmed GMW. *Id.* at 1222. Indeed, in affirming the federal district court's grant of summary judgment, the Tenth Circuit concluded that the "undisputed" facts "establish[ed] that it was [GMW's] *own* failures—occurring even before the Hall Defendants arrived—that destroyed its own venture." *Id.* The court explained further that "there was no evidence showing that the cause of GMW's lost profits was the conduct of . . . the Hall Defendants." *Id.* More specifically, the Tenth Circuit determined,

> What is missing here, and indeed throughout this appeal, is the connection between [the Hall] Defendants' alleged bad acts and GMW's failed venture.
>
> GMW, effectively, had to, but did not, proffer admissible evidence establishing that GMW's prospective venture partners were actually motivated to abandon GMW due to [the Hall] Defendants' illicit conduct. In the end, despite [the Hall Defendants' bad acts], there is still no causal link between those actions and GMW's failure to abide by the Cooperation Agreement it entered into with AsiaSat.

*Id.* at 1211–12 (cleaned up).

¶17 GMW's complaint in state court framed the causation issue in a manner essentially identical to its federal complaint. Indeed, GMW claimed that Durham Jones and Anderson "breached their duties to their client, [GMW], by aiding another group of clients, [the Hall Defendants], to misappropriate [GMW's] promising, revolutionary, and well-developed business opportunity." As this court has previously explained, issues are identical "when a party

attempts to relitigate the factual question of why something occurred and the newly alleged cause for the occurrence was rejected as a defense in a prior action." *Fowler v. Teynor*, 2014 UT App 66, ¶ 21, 323 P.3d 594. This is precisely what GMW attempted to do in the state court action. The decision in the Federal Action determined that it was GMW's "*own* failures—occurring even before the Hall Defendants arrived—that destroyed its own venture" and that "it was GMW's inability to satisfy the Cooperation Agreement that was the cause of any of its lost profits from the failed venture." *GeoMetWatch*, 38 F.4th at 1222. Thus, the unassailable truth—at least insofar as issue preclusion is concerned—is that GMW's actions or shortcomings caused its own damages in the way of lost profits.

¶18　The preclusive effect of the Federal Action is logically inescapable. If the Hall Defendants' conduct did not cause GMW's business failure, Durham Jones and Anderson's alleged legal assistance to the Hall Defendants could not have caused the failure either. Put another way, if GMW itself—and not the Hall Defendants—caused its own lost profits, it necessarily follows that Durham Jones and Anderson did not cause GMW's lost profits by allegedly *aiding* the Hall Defendants. Any way it is expressed, the issue of causation remains the same: GMW itself caused whatever harm it had allegedly suffered. The Federal Action "conclusively determined *why*" GMW had suffered the alleged harm, namely, GMW's failure to meet the terms of the Operation Agreement, which resolves the issue of whether Durham Jones and Anderson's actions caused the alleged harm to GMW. *See Fowler*, 2014 UT App 66, ¶¶ 1, 4, 13–14 (concluding a plaintiff's negligence claims arising from the termination of his employment were barred by collateral estoppel because prior federal litigation conclusively determined that the employer was responsible for the plaintiff's termination, which "necessarily resolved the issue" in state litigation of whether a different party was responsible for the termination).

¶19 GMW resists this conclusion about the preclusive effect of the Federal Action by arguing that a more demanding burden of proof (namely, more likely than not) was applied in the Federal Action than that required for legal malpractice claims in Utah, which GMW argues is a "reasonable likelihood" standard. *See Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1291 (Utah Ct. App. 1996) ("To prevail in legal malpractice actions, clients must establish actual cause—that but for the attorney's wrong their loss would not have occurred—and proximate cause—that a reasonable likelihood exists that they would have ultimately benefited."). As we understand GMW's argument, it goes as follows: the state lawsuit moored itself on a legal malpractice claim, so it represented a different issue requiring the application of the more lenient burden of proof applicable to legal malpractice claims, which, in turn, would have more readily allowed GMW to establish legal causation with regard to Durham Jones and Anderson's actions. But this argument is without consequence under the circumstances of the present case, where the Federal Action determined that there was *no* evidence that anyone other than GMW itself was the cause of the alleged harm. *See GeoMetWatch*, 38 F.4th at 1203 ("GMW proffered no evidence to establish its causation theories." (cleaned up)). In other words, the *issue* was causation, and that issue was resolved in the Federal Action. Therefore, the burden of proof required is wholly immaterial because GMW entirely caused its own damages. *Cf. Blank v. Garff Enters. Inc.*, 2021 UT App 6, ¶ 30, 482 P.3d 258 ("The question of causation is generally reserved for the jury, but the district court may rule as a matter of law on this issue if there is no evidence to establish a causal connection, thus leaving causation to jury speculation." (cleaned up)); *State Farm Fire & Cas. Co. v. Steffen*, 948 F. Supp. 2d 434, 446 (E.D. Pa. 2013) ("Since [the insurer] cannot point to any admissible causation evidence in the summary judgment record, it has failed to establish a *prima facie* negligence claim and it must succumb to summary judgment."). This principle effectively removes burden of proof considerations from the analysis when causation evidence is entirely absent—or,

as here, when causation has been definitively and exclusively assigned to the party arguing that it has been damaged. Accordingly, the decision from the Federal Action retains its preclusive effect regardless of the standard of proof used. Since all evidence points to GMW being solely responsible for its own losses, it was not possible for GMW to have avoided the harm even in the absence of Durham Jones and Anderson's conduct.

¶20 GMW also asserts that causation could have been established had the court considered newly proffered expert testimony on one of its damages claims (namely, under Scenario 3), which it asserts turned on different facts. This argument is unavailing. First, it does not address the fundamental issue of causation, which remains the same in all three of the lost-profit scenarios GMW advanced. No matter how GMW attempts to spin it, the Federal Action definitively resolved the issue of causation when the federal district court determined that GMW alone was responsible for its losses. Having new expert testimony does not change this preclusive causal determination. Moreover, "litigation of an issue necessarily encompasses all arguments and evidence that could be presented to resolve the issue, and . . . the mere discovery of new evidence does not create a *new issue*." *Liberty Mutual Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 762 (8th Cir. 2003) (emphasis added). This means that "litigants may not have a second opportunity to prove a fact or make an argument relating to an issue previously decided." *Id.* Accordingly, "[o]nce a plaintiff has had a chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence." *Pignons SA de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 2 (1st Cir. 1983). By seeking to introduce new expert testimony, GMW essentially attempts to do an end run around issue preclusion. The problem for GMW is that the doctrine "bars relitigation of the same issues" but "does not require identity of legal theories or causes of action." *Evans v. Celotex Corp.*, 238 Cal. Rptr. 259, 261–62 (Ct. App. 1987). If it required identity of legal theories, "there would be no end to litigation for injuries arising

out of the same facts, as long as a party could offer another legal theory by which the same issue might be differently decided." *Id.* at 262. This is precisely what GMW attempts to do here by seeking the introduction of new expert testimony and thereby building its case on a different legal theory, while ignoring that the issue of causation has been definitively resolved. Adopting GMW's argument that it should be allowed to proffer new expert evidence to overcome issue preclusion would "eviscerate the doctrine of issue preclusion" and create endless opportunities for relitigation. *See Liberty Mutual Ins. Co.*, 335 F.3d at 765. This we will not do.

¶21    Thus, because the identical issue of causation was fully and fairly litigated in the Federal Action, the district court correctly applied issue preclusion to dismiss the lost profits theories of recovery on the basis of that doctrine. And GMW's argument that it proffered different expert testimony in the state court action does not alter the preclusive effect of the Federal Action's determination that GMW caused its own losses.

## II. Causation for Lost Business Value

¶22    GMW argues the district court erred in dismissing its remaining theory of recovery for lost business value as articulated in Scenario 4. This theory posited that Durham Jones and Anderson's conduct destroyed the entire value of GMW's business. The state district court granted summary judgment, finding GMW presented "no nonspeculative evidence" regarding causation or damages. We detect no error in the district court's grant of summary judgment. For purposes of our analysis, we assume that GMW suffered a loss in business value and focus only on the cause of that alleged loss.[5]

---

5. Durham Jones and Anderson assert that lost business value has not been adopted as a measure of damages in Utah. Because we determine that any claim GMW asserted with regard to lost

(continued…)

¶23    To prevail in a legal malpractice action, "a plaintiff must show (1) the existence of an attorney-client relationship; (2) breach of the attorney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client." *Gregory & Swapp, PLLC v. Kranendonk*, 2018 UT 36, ¶ 38, 424 P.3d 897 (cleaned up). And causation is of special moment in this analysis. "Because this causation requirement is a crucial and distinct element to any malpractice claim, an abundance of evidence as to breach of duty cannot make up for a deficiency of evidence as to causation." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 113, 372 P.3d 629. All this is to say that without causation, a legal malpractice action has no traction from the outset.

¶24    Parties cannot overcome summary judgment based on lack of causation by relying on vague, doubtful, or inconclusive assertions. "In Utah, causation or the connection between fault and damages in legal malpractice actions cannot properly be based on speculation or conjecture. To prevail in legal malpractice actions, clients must establish actual cause—that but for the attorney's wrong their loss would not have occurred—and proximate cause—that a reasonable likelihood exists that they would have ultimately benefited." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1291 (Utah Ct. App. 1996). "A causation determination is generally a question of fact, but the trial court may make a legal ruling on this issue if (1) there is no evidence to establish a causal connection, thus leaving causation to jury speculation, or (2) where reasonable persons could not differ on the inferences to be derived from the evidence on proximate causation." *Ladd v. Bowers Trucking, Inc.*, 2011 UT App 355, ¶ 10, 264 P.3d 752 (cleaned up).

---

business value fails on the threshold requirement of causation, we need not address whether lost business value is recognized as a measure of damages in Utah. Accordingly, we take no position on the status of this theory under Utah law.

¶25 Thus, while Durham Jones and Anderson owed a duty to GMW and likely violated it by representing the Hall Defendants, demonstrating that a breach occurred is just a preliminary step— a step that does not show that damages were suffered *because* of that breach. In other words, a legitimate claim for compensation that will survive summary judgment requires nonspeculative proof directly tying the breach to the alleged damage. *See Hardy v. Sagacious Grace LC*, 2021 UT App 23, ¶ 21, 483 P.3d 1275 ("When the facts are so tenuous, vague, or insufficiently established that determining an issue of fact becomes completely speculative, the claim fails as a matter of law, and summary judgment is appropriate." (cleaned up)).

¶26 GMW asserts that it did enough to stave off summary judgment because there were issues of fact as to three points that the district court improperly weighed. We reject these arguments because the record is devoid of any factual foundation that would allow a factfinder to conclude—without resort to speculation— that Durham Jones and Anderson's breach resulted in GMW's claimed loss of business value. We consider each argument in turn.

A.     Salvaging Business Relationships

¶27 While GMW contends that it could have taken steps to save its business relationships had Durham Jones and Anderson not breached their duty, there is no evidence proving these theoretical actions would have made a difference. The claim that GMW would have seamlessly maintained its partnerships absent Durham Jones and Anderson's actions rests entirely on conjecture. In other words, the limited evidence GMW submitted regarding causation in this matter consists of self-serving declarations and personal belief rather than established facts, making it inadmissible for summary judgment purposes. GMW asserts that had Durham Jones and Anderson complied with their duties and disclosed Hall's actions to GMW earlier, GMW would

have taken actions to salvage its relationships with AsiaSat and Utah State and limit Hall's access to information that could have been used to undermine GMW. GMW also argues that it had options to develop a business relationship with other satellite providers and manufacturers, which could have been established by newly proffered expert testimony.

¶28    The problem with this newly proffered evidence is that it consists entirely of one-sided and unsupported assertions, meaning that it exclusively rests on GMW's hopes and aspirations that it might have salvaged its business relationships or developed new ones. What is entirely missing from GMW's proffered evidence is any evidence suggesting that GMW could have done anything to repair its damaged relationships with its one-time business partners—namely, Utah State and AsiaSat—after the Hall Defendants sent the email on November 3, 2013, proposing to establish a new company to build and market the STORM sensor or anything GMW might have done had Durham Jones and Anderson alerted GMW about Hall's actions at any point. As the district court explained, "no matter how much evidence there may be of duty and breach, [GMW still had to] offer nonspeculative evidence that damages were caused by the breach." And this evidence had to include more than GMW's self-serving assertions about what it might have done in order to avoid basing its assertions on speculation—or, as we have often said, to avoid building its "case on the gossamer threads of whimsy, speculation and conjecture." *JENCO LC v. Perkins Coie LLP*, 2016 UT App 140, ¶ 15, 378 P.3d 131 (cleaned up). To put it bluntly, GMW produced nothing apart from its own unsubstantiated assertions that it could have saved the enterprise in the absence of Durham Jones and Anderson's alleged misconduct. To be sure, GMW produced experts who said the company could have repaired the damage, but none of this proffered evidence

provided a nonspeculative factual foundation from which to draw such an optimistic inference.[6]

B.      Obtaining Alternative Financing

¶29    The assertion that GMW could have found alternative financing absent Durham Jones and Anderson's breach is also unsubstantiated and properly disregarded as a statement of belief rather than fact. This conclusion directly mirrors the approach taken in the Federal Action, which, as the district court observed,

---

6. GMW resists this conclusion by invoking *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283 (Utah Ct. App. 1996). In that case, a trial court granted summary judgment in favor of a law firm on a legal malpractice claim, concluding that a television broadcaster had failed to show that the law firm's breach of fiduciary duty proximately caused damage to the broadcaster. *Id.* at 1286, 1289. This court reversed, concluding that the broadcaster had presented evidence that it would have received financing if the law firm had not breached its fiduciary duties. *Id.* at 1292–93. We held, "The trial court improperly weighed evidence to reach its determination that material issues of fact surrounding causation were undisputed. The [broadcaster] presented evidence that created genuine issues of material fact; therefore, the trial court inappropriately granted summary judgment." *Id.* at 1293. But *Kilpatrick* is easily distinguishable and therefore is not determinative here because the broadcaster had presented evidence that it was prepared to accept an alternative financing commitment that was already on the table. *See id.* at 1287. Accordingly, the factual evidence in *Kilpatrick* was not of the vague and tenuous nature present here. Moreover, the trial court had also engaged in the improper exercise of weighing competent evidence on summary judgment. *See id.* at 1292. That's not what happened here, where the district court determined that the evidence was too speculative to be considered. Accordingly, the case does not offer the refuge GMW suggests.

"conclusively determined that it was entirely speculative that any alternative funding would have been had, or that [GMW] would have been successful, and [that there was] no evidence ultimately that absent [the Hall Defendants'] actions, . . . [GMW's] business venture would have gone forward." The Federal Action concluded that the expert opinions GMW offered on this matter "simply assume that GMW would have been able to secure financing for its venture despite its inability to do so before the Hall Defendants arrived on the scene" and "rely on nothing more than mere speculation and conjecture that is, in critical respects, directly at odds with the observed conditions faced by GMW before the Hall Defendants entered the picture." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1209 (10th Cir. 2022) (cleaned up). Therefore, just as the Hall Defendants in the Federal Action were found as a matter of law not to have prevented GMW from obtaining funding, there is no evidence that Durham Jones and Anderson caused harm merely by representing the Hall Defendants or by failing to alert GMW to Hall's activities. As we noted, *supra* ¶ 23, causation is a mandatory element of the claim, and GMW's assertion that Durham Jones and Anderson's alleged breach prevented it from obtaining alternative funding simply lacks a nonspeculative evidentiary foundation. And GMW's assertion here is speculative because it has offered no evidence of any individual or entity that was actually willing or committed to provide the financing. *Cf. Christensen & Jensen, PC v. Barrett & Daines*, 2008 UT 64, ¶ 25, 194 P.3d 931 ("Although each of the theories . . . deals with a different type of harm, the same standard of causation applies whether the alleged wrong is a negligent act, a fiduciary breach, or even a contractual breach." (cleaned up)).

C.    Avoiding Litigation

¶30    GMW also contends that there was a factual dispute as to whether the Hall Defendants would have filed the lawsuit, *see supra* ¶ 9, if Durham Jones and Anderson had not breached their duties. GMW points to deposition testimony from an officer of

GMW that fighting a "lawsuit makes it very difficult to take additional money." GMW contends that if Durham Jones and Anderson had informed it of the Hall Defendants' intentions in a timely fashion, then the Hall Defendants "may not have pursued" a takeover of GMW's business by initiating expensive litigation. Again, the problem with this argument is that it rests on an entirely speculative foundation. As the district court observed, "[t]here is no evidence that [the Hall Defendants] would have been persuaded, thwarted, [or] delayed in any way whatsoever in pursuing [legal] claims against GMW had [Durham Jones and Anderson] not breached their duties." Even on appeal, GMW argues in strikingly speculative terms that the Hall Defendants "*might* not have been comfortable or able" to pursue legal claims against GMW and "*may* not have been gung ho about the claims" absent Durham Jones and Anderson's breach. (Emphasis added.) While no one would dispute that a lawsuit of this nature would come as unwelcome news to a struggling company, GMW must do more than show it was burdened by the litigation. Most importantly, to avoid summary judgment, it must show— through non-speculative evidence—that Durham Jones and Anderson's breach caused the Hall Defendants to pursue the litigation against GMW. But GMW, as the district court concluded, has not come close to offering such evidence. At best, GMW has offered only speculation about what the Hall Defendants might have done in the absence of Durham Jones and Anderson's breach. But that's not material evidence; instead, it is merely the "tenuous, vague, or insufficiently established" musings that result in summary judgment. *See Hardy*, 2021 UT App 23, ¶ 21 (cleaned up).

¶31 All this boils down to the simple reality that there is no evidence that anyone other than GMW caused the damages it suffered—no matter how the damages were expressed and notwithstanding Durham Jones and Anderson's probable breach. Accordingly, with only speculative evidence that Durham Jones and Anderson caused GMW to suffer lost business value before

the district court, we see no error in the grant of summary judgment in favor of Durham Jones and Anderson on this issue.

CONCLUSION

¶32    The decision in the Federal Action conclusively established that GMW's inability to obtain financing—not the conduct of the Hall Defendants—caused the failure of its business venture. This finding precludes GMW from relitigating causation against Durham Jones and Anderson regarding its supposedly lost profits. Furthermore, GMW failed to proffer nonspeculative evidence that Durham Jones and Anderson caused the destruction of its business value.

¶33    Affirmed.

_____